# EXHIBIT C

AGENCY:   QNMD
AGENT:    KEVIN J WILSHUSEN
MAIL TO:  525614
POLICY:   4209668408

SIG

ROBERT W RUTLEDGE
19886 HARVEST DR
LAKEVILLE, MN 55044



January 14, 2021

ROBERT W RUTLEDGE
19886 HARVEST DR
LAKEVILLE, MN 55044


Insured:        ROBERT W RUTLEDGE
Policy Number:   4209668408


Dear ROBERT W RUTLEDGE:

We are pleased to enclose your new insurance policy issued by American General Life Insurance Company. We appreciate the confidence you have placed in American General Life Insurance Company and our licensed agent, Matrix Direct Insurance Services.

Please take a moment to complete and return the following policy issue requirements:

Policy Acceptance and Amendment of Application
Bank Draft Auth
Monthly premium in the amount of $179.54 will be drafted for each outstanding premium at the time delivery requirements are received. These premiums can be drafted once a new bank draft authorization is received.

The policy issue requirements should be sent to American General Life Insurance Company at P.O. Box 733479, Dallas, Texas 75373-3479 as soon as possible. If initial premium is required, please make a check payable to American General Life Insurance Company for the amount indicated above. Your policy will become effective once we receive the balance of the premium and any other delivery requirements. **This offer is valid for 30 days**.

You may request that corrections be made to the information discussed above. If your requested corrections are not made, you will be notified and told of the reason(s) for the refusal. In that event, you may submit a statement indicating why you disagree with our refusal to change that information.

Again, thank you for this opportunity to be of service to you. If you have any questions, please call Matrix Direct toll free at 1-800-318-1383.  Assistance is available weekdays from 7:00 a.m. until 5:00 p.m. Pacific time.


Sincerely,

New Business Department

cc:  KEVIN J WILSHUSEN, 525614/QNMD



☑ **American General Life Insurance Company, 2727-A Allen Parkway, Houston, Texas 77019**
☐ **The United States Life Insurance Company in the City of New York, 175 Water Street, New York, NY 10038**
*A member of American International Group, Inc. (AIG)*

In this amendment, the "Company" refers to the insurance company whose name is checked above.

The insurance company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other company is responsible for such obligations or payments.

## Proposed Insured

Primary Proposed Insured: First Name   ROBERT                 MI   W   Last Name   RUTLEDGE

Other Proposed Insured: First Name                           MI         Last Name

Policy Number:   4209668408

I hereby acknowledge receipt and acceptance of the policy described below. I also accept all matters set forth in the policy which was issued that differ from the policy for which application was made. I understand and agree that the original application is deemed to be altered as follows:

- Application amended with Primary Insured's Name as ROBERT RUTLEDGE
- Application amended with the Primary Beneficiary as follows: PRATIWI RUTLEDGE,Spouse,100%

I represent, on behalf of myself and any person who may have been proposed for insurance, that to the best of my knowledge and belief:
1. There have been no changes to my occupation nor have I become unemployed since the date of the application; or
2. Neither I nor any other proposed insured has, since the date of the application:
   a. Consulted a licensed health care provider or received medical or surgical advice or treatment; or
   b. Acquired any knowledge or belief that any representation in the application, including information provided or an answer to a question, is now inaccurate, incomplete, or untrue.

Exceptions:

**In the event any exception is noted herein, the policy will not be in force until the Company approves this Policy Acceptance and Amendment of Application.**

**Agreement:** I hereby represent that I have read (or have had read to me) and understand the statements made above. I agree that this Policy Acceptance and Amendment of Application will be made a part of the policy.

**Owner Signature**

X

**Owner signed on** (date) _____
**Show title of officer if signing for the business.**

**Proposed Insured (PPI) Signature** (if other than Owner)

X

*(If under age 16, signature of parent or guardian)*
**PPI signed on** (date) _____
**Other Proposed Insured (OPI) Signature** (if other than Owner)

X

*(If under age 16 and coverage exceeds $500,000, signature of both parents required.)*
**OPI signed on** (date) _____



**Summary and Disclosure Notice for
Critical Illness Accelerated Death Benefit Rider,
Chronic Illness Accelerated Death Benefit Rider, and
Terminal Illness Accelerated Death Benefit Rider**

**American General Life Insurance Company,** 2727-A Allen Parkway, Houston, TX 77019
*A member of American International Group, Inc. (AIG)*

Receipt of a benefit under an accelerated death benefit rider will reduce any death benefit that may become payable under the policy to which the rider is attached.

## PURPOSE OF THIS SUMMARY AND DISCLOSURE

This Summary provides a brief description of the basic features of the accelerated death benefit riders described below. This is not an insurance contract, but only a summary of the coverage provided by each rider. If a policy is issued, it is important to check the policy for details on any accelerated death benefit rider that is included in the policy. It is also important to carefully read any accelerated death benefit rider included in the policy.

## TAX CONSEQUENCES

Benefits paid under the Critical Illness Accelerated Death Benefit Rider may cause the Owner to incur a tax obligation. Benefits paid under the Chronic Illness Accelerated Death Benefit Rider or the Terminal Illness Accelerated Death Benefit Rider are intended to qualify for favorable tax treatment but **MAY BE TAXABLE IN SOME CIRCUMSTANCES. Neither the Company nor its agents are authorized to offer you tax advice. You should consult your accountant, attorney or other qualified tax professional to assess the impact of a benefit. We recommend that you contact a tax advisor when making tax-related decisions about electing to receive and use benefits from an accelerated death benefit rider.**

## ACCELERATED DEATH BENEFIT RIDER DESCRIPTIONS

**Critical Illness Accelerated Death Benefit Rider**
The Critical Illness Accelerated Death Benefit Rider provides that the Owner may elect an accelerated death benefit if the Insured Person is diagnosed as having a Qualifying Critical Illness, subject to the provisions of the rider. Qualifying Critical Illness means the occurrence of any of the following illnesses or conditions as to an Insured Person – Major Heart Attack, Stroke, Coronary Artery Bypass, Invasive Cancer, End Stage Renal Failure. Major Organ Transplant, Paralysis, Coma and Severe Burn:

1. Which a physician has diagnosed within 365 days of the date of our receipt of certification at our claim office pursuant to a claim under the rider; and

2. Which a physician has diagnosed after such Insured Person's coverage under the rider has been in force for 30 consecutive days, or 90 consecutive days for Invasive Cancer; and

3. Which is not an occurrence of the same illness or condition for which an accelerated benefit was previously paid under the rider as to the Insured Person.

**Chronic Illness Accelerated Death Benefit Rider**
The Chronic Illness Accelerated Death Benefit Rider provides that the Owner may elect an accelerated death benefit if the Insured Person is certified as having a Qualifying Chronic Illness, subject to the provisions of the rider. Qualifying Chronic Illness means an illness or condition that:

(1) A licensed health care practitioner has certified within the past 12 months as affecting the Insured Person so that he or she:

    (a) Is unable to perform, without substantial assistance from another person, at least two Activities of Daily Living for a period of at least 90 consecutive days due to a loss of functional capacity; or

    (b) Requires substantial supervision to protect such Insured Person from threats to health and safety due to Severe Cognitive Impairment; and

(2) A licensed health care practitioner has certified within the past 12 months as affecting the Insured Person so that he or she is under a plan of care prescribed by a licensed health care practitioner for necessary diagnostic, preventative, therapeutic, curing, treating, mitigating and rehabilitative services and for maintenance or personal care services required by a person with such illness or condition; and

(3) A licensed health care practitioner has certified after such Insured Person's coverage under the rider has been in force for 30 consecutive days.

AGLC110233

No Chronic Illness Accelerated Death Benefit will be payable for an illness or condition caused by alcoholism, drug addiction, or a mental or nervous disorder (except for disorders comparable to Alzheimer's disease and similar forms of irreversible dementia).

The term "Elimination Period" means a period of 90 consecutive days beginning at any time after the Insured Person's coverage under the rider has been in force for 30 consecutive days, during which Elimination Period the Insured Person must continuously have a Qualifying Chronic Illness prior to eligibility for benefits under this rider. No Accelerated Benefit is payable during the Elimination Period.

The Activities of Daily Living are Bathing, Continence, Dressing, Eating, Toileting and Transferring.

Severe Cognitive Impairment means a loss or deterioration in intellectual capacity that is comparable to (and includes) Alzheimer's disease and similar forms of irreversible dementia and is measured by clinical evidence and standardized tests that reliably measure impairment in the person's:

(1) Short-term or long-term memory; and

(2) Orientation as to people, places or time; and

(3) Deductive or abstract reasoning.

### Terminal Illness Accelerated Death Benefit Rider
The Terminal Illness Accelerated Death Benefit Rider provides that the Owner may elect an accelerated death benefit if the Insured Person is certified as having a Qualifying Terminal Illness, subject to the provisions of the rider. Qualifying Terminal Illness means an illness or condition which a physician has diagnosed and reasonably expects to result in the Insured Person's death within 24 months or less from the date of diagnosis.

### Accelerated Benefit
The term "Accelerated Benefit" means each Critical Illness, Chronic Illness, or Terminal Illness Accelerated Death Benefit Amount paid to the Owner during the Insured Person's lifetime.

### Critical, Chronic, and Terminal Illness Accelerated Death Benefit Amounts
The terms "Critical Illness Accelerated Death Benefit Amount," "Chronic Illness Accelerated Death Benefit Amount," and "Terminal Illness Accelerated Death Benefit Amount" mean:

(1) The maximum dollar amount that We determine can be payable with respect to a claim under the rider to the Owner upon satisfaction of all applicable provisions and requirements under the applicable rider and the Policy; or

(2) Any lesser amount elected by the Owner to be received under the rider.

The Critical, Chronic, or Terminal Illness Accelerated Death Benefit Amount for a Qualifying Critical Illness, Chronic Illness, or Terminal Illness, as applicable, will never be less than the applicable Minimum Accelerated Benefit Amount for such Qualifying Critical, Chronic, or Terminal Illness.

The Critical, Chronic, or Terminal Illness Accelerated Death Benefit Amount will be equal to the death benefit you elect to accelerate, less the following deductions:

(1) The actuarial discount determined by us; and

(2) An administrative fee, not to exceed the maximum administrative fee shown in the rider; and

(3) Payment of any unpaid but due policy premiums; and

(4) If applicable, payment of a pro rata amount of any policy loans.

If we determine that the conditions for payment of an accelerated benefit have been met, we will notify you of the Critical, Chronic, or Terminal Illness Accelerated Death Benefit Amount that you may elect, if any, for a Qualifying Critical, Chronic, or Terminal Illness, and we will send you an election form. You must complete the election form and return it to us within the Election Period shown in the rider. The failure to provide the required election form within the election period may preclude payment of a benefit.

You may choose either to elect or not to elect a Critical, Chronic, or Terminal Illness Accelerated Death Benefit Amount that will be paid as an Accelerated Benefit for such Qualifying Critical, Chronic, or Terminal Illness, as applicable.

**If, as to the occurrence of a Qualifying Critical Illness, you decide not to elect a Critical Illness Accelerated Death Benefit Amount or if you decide to elect to receive less than the maximum Accelerated Benefit for such Qualifying Critical Illness, you cannot thereafter elect a Critical Illness Accelerated Death Benefit Amount for the same occurrence of such Qualifying Critical Illness.**

Any Accelerated Benefit with respect to a Critical Illness Accelerated Death Benefit Amount or a Terminal Illness Accelerated Death Benefit Amount will be paid in one lump sum. Any Accelerated Benefit with respect to a Chronic Illness Accelerated Death Benefit Amount may be paid in one lump sum or in periodic payments.

AGLC110293

## MEDICAID/GOVERNMENT BENEFITS

Receipt of accelerated death benefits from a life insurance policy MAY AFFECT YOUR ELIGIBILITY FOR MEDICAID AND SUPPLEMENTAL SECURITY INCOME ("SSI"), OR OTHER GOVERNMENT PROGRAMS. In addition, exercising the option to accelerate the death benefit and receiving that benefit before you apply for these programs, or while you are receiving government benefits, may affect your initial or continued eligibility. Contact the Medicaid Unit of your local Division of Medical Assistance and the Social Security Administration for more information.

## IMPORTANT NOTICES

**There is no premium or charge to include a Critical Illness Accelerated Death Benefit Rider, Chronic Illness Accelerated Death Benefit Rider, or Terminal Illness Accelerated Death Benefit Rider on a policy. Accelerated benefits do not and are not intended to qualify as long-term care insurance.**

**Important Consumer Disclosures Applicable to Critical Illness Accelerated Death Benefit Rider, Chronic Illness Accelerated Death Benefit Rider, and Terminal Illness Accelerated Death Benefit Rider**

(1) When filing a claim for Qualifying Critical Illness under a Critical Illness Accelerated Death Benefit Rider, for Qualifying Chronic Illness under a Chronic Illness Accelerated Death Benefit Rider or for Qualifying Terminal Illness under a Terminal Illness Accelerated Death Benefit Rider, the claimant must provide to the Company a completed claim form and then-current Certification which must be received at its Administrative Center.

(2) If a benefit under the Critical Illness Accelerated Death Benefit Rider is payable, the Company will provide the Owner with one (1) opportunity to elect a Critical Illness Accelerated Death Benefit Amount as to the occurrence of the Qualifying Critical Illness in question. To make such an election, the Owner must complete an election form and return it to AGL within the Election Period set forth in the rider (i.e., within 60 days of the owner's receipt of the election form). **The Company will not provide a later opportunity to elect a Critical Illness Accelerated Death Benefit Amount under a Policy as to the same occurrence of a Qualifying Critical Illness.**

(3) If a benefit under the Chronic Illness Accelerated Death Benefit Rider or under the Terminal Illness Accelerated Death Benefit Rider is payable, the Company will provide the Owner with an opportunity to elect a Chronic Illness Accelerated Death Benefit Amount as to the Qualifying Chronic Illness in question or to elect a Terminal Illness Accelerated Death Benefit Amount as to the Qualifying Terminal Illness in question, as applicable. To make an election, the Owner must complete an election form and return it to AGL within 60 days of the Owner's receipt of the election form.

(4) **Under certain circumstances where an insured's mortality (i.e., our expectation of the insured's life expectancy) is not significantly changed by a Qualifying Critical Illness or a Qualifying Chronic Illness and, notwithstanding the Minimum Accelerated Benefit Amount provision, the accelerated benefit may be zero.**

(5) The failure to provide a required election form (with the requested attachments) within the Election Period provided by the applicable rider (i.e., within 60 days of the owner's receipt of the election form) may preclude payment of a benefit.

(6) Benefits payable under an accelerated death benefit rider may be taxable. Neither American General Life Insurance Company nor any agent representing it is authorized to give legal or tax advice. Please consult a qualified legal or tax advisor regarding questions concerning the information and concepts contained in this material.

(7) Generally, we will send you an IRS Form 1099-LTC if you receive an accelerated death benefit on account of a Qualifying Chronic Illness or a Qualifying Terminal Illness. We will send you an IRS Form 1099-R if you receive an accelerated death benefit on account of a Qualifying Critical Illness.

The sum that will be included in Box 2 (Accelerated death benefits paid) of IRS Form 1099-LTC or in Box 1 (Gross distribution) of IRS Form 1099-R will be the actual sum you received by check or otherwise minus any refund of premium and/or loan interest included with our benefit payment plus any unpaid but due policy premium, if applicable, and/or pro rata amount of any loan balance.

(8) The maximum amount of life insurance death benefits that may be accelerated as to an Insured Person under all accelerated benefit riders is the lesser of the existing amount of such death benefits or a lifetime maximum of $2,000,000.

(9) See your policy for details.

**Notice Regarding Substitution of one Policy with Accelerated Death Benefit Riders (ABRs) for a previously-issued Policy with different ABRs**

If I am applying to substitute a policy with ABRs for a previously-issued policy with different ABRs, I acknowledge that I have carefully compared (or have had the opportunity to carefully compare) the benefits of the replaced policy with the benefits of the new policy for which I am applying. I further acknowledge:

(1) That some or all of the benefits under the ABRs on the existing policy differ from those in the new ABRs;

(2) That some or all of the benefits under the existing ABRs on the existing policy noted may be more advantageous to me than those under the applied-for ABRs;

(3) That some of benefits under the new ABRs may be more advantageous to me than those under the existing ABRs; and

(4) That the applied-for ABRs may exclude coverage for claims arising from conditions for which the existing ABRs on the policy noted above may provide coverage.

## ACKNOWLEDGMENT

I acknowledge that I have reviewed this Summary and Disclosure Notice and have received a copy of it, if required, and will be provided a copy with my policy.

The applicant was shown a copy of this Summary and Disclosure Notice prior to executing an application.

**Owner's Signature**

eSigned by Bob W Rutledge on 1/4/2021 at 2:50 PM CST
**X**

**Owner signed on** (date) 1/4/2021

**Owner Title** _____
          *(If Corporate Officer or Trustee)*

**Agent's Signature**

X _~~K. J. Will~~_

**Agent signed on** (date) 1/4/2021

AGLC110233

# Your Insurance Policy Contract

Policies issued by American General Life Insurance Company (AGL) except in New York, where issued by The United States Life Insurance Company in the City of New York (US Life).  Issuing companies AGL and US Life are responsible for financial obligations of insurance products and are members of American International Group, Inc. (AIG).

# AMERICAN GENERAL LIFE
## Insurance Company
### A Stock Company

Home Office:
Houston, Texas

**ROBERT W RUTLEDGE**
**POLICY NUMBER: 4209668408**

2727-A Allen Parkway
Houston, Texas 77019

(713) 522-1111

**WE WILL PAY THE DEATH BENEFIT** to the Beneficiary if the Insured dies while this policy is in force. Payment will be made after We receive Due Proof of Death of the Insured, and will be subject to the terms of this policy.

The consideration for this policy is the application and payment of the first premium. The first premium must be paid on or before delivery of this policy.

This is an INDETERMINATE PREMIUM TERM LIFE INSURANCE POLICY WITH A CHANGE IN THE FACE AMOUNT AFTER THE LEVEL PREMIUM PERIOD. A Death Benefit is payable upon the Insured's death while this policy is in force prior to the Termination Date of the Last Renewal Term Period. Premium payments are payable for the term period shown on the Policy Schedule. This policy is ANNUALLY RENEWABLE, CONVERTIBLE and contains RE-ENTRY OPTION. NONPARTICIPATING - THIS POLICY WILL NOT PAY DIVIDENDS.

## NOTICE OF RIGHT TO EXAMINE POLICY

**You may return this policy within ten\* days after delivery if You are not satisfied with it for any reason. This policy may be returned to Us or to the agent through whom it was purchased. Upon surrender of this policy within the ten\* day period, it will be void from the beginning, and We will refund any premium paid.**

\* If the application for this policy indicates a replacement, the number of days is thirty days or longer if required by the applicable law in the state where this policy is issued for delivery.

SIGNED AT THE HOME OFFICE ON THE DATE OF ISSUE.

*Julie Cotter Hearne*

Secretary

*K H Hogan*

President

**INDETERMINATE PREMIUM TERM LIFE INSURANCE POLICY**
**CHANGE IN FACE AMOUNT AFTER LEVEL PREMIUM PERIOD**
**ANNUALLY RENEWABLE AND CONVERTIBLE**
**30 YEAR LEVEL PREMIUM PERIOD**
**NONPARTICIPATING**
**READ YOUR POLICY CAREFULLY**

ICC19-19311

# INDEX

| | | | |
|---|---|---|---|
| Beneficiary and Proceeds | 6, 7 | Incontestability | 9, 10 |
| Change in Face Amount | 6 | Owner | 5 |
| Change of Ownership or Beneficiary | 7 | Payment Options | 7-9 |
| Contract | 5 | Premium Payments | 5, 6 |
| Conversion and Renewal Provisions | 12-13 | Re-Entry Option | 11, 12 |
| Date of Issue | 3, 5 | Reinstatement | 10, 11 |
| Death Benefit | 6 | Suicide Exclusion | 10 |
| Definitions | 2 | Table of Premiums and Face Amounts | 4 |
| General Provisions | 9-11 | When this Policy Terminates | 10 |
| Grace Period | 6 | | |

# DEFINITIONS

**Company Reference.** The words "We", "Our", "Us", or "Company" mean American General Life Insurance Company.

**"You", "Your."** The words "You" or "Your" mean the Owner of this policy.

**Home Office.** Our office at 2727-A Allen Parkway, Houston, Texas 77019; Mailing Address P.O. Box 1931, Houston, Texas 77210-1931.

**Written, In Writing.** A written request or notice in acceptable form and content, which is signed and dated, and received at Our Administrative Center.

**Premium Class.** The risk classification assigned to the Insured under this policy. The Premium Class is shown on the Policy Schedule.

**Administrative Center**. The term "Administrative Center" means Our service center to which You should direct all requests, instructions and other communications. Our Administrative Center is located at 2727-A Allen Parkway, Houston, Texas 77019.

**Age.** The word "Age" means the Insured's age nearest birthday as of the Date of Issue.

**Attained Age.** The term "Attained Age" means the Insured's Age plus the number of years and completed months from the Date of Issue.

**Initial Face Amount.** The term "Initial Face Amount" means the Face Amount of this policy on the Date of Issue.

**Level Premium Period.** The term "Level Premium Period" means the period of time during which premiums cannot change. The Level Premium Period is shown on the Policy Schedule.

**Renewal Term Period.** The term "Renewal Term Period" means each one-year period after the Level Premium Period for which this policy may be renewed but premiums can change.

## NOTICE
This Policy Is A Legal Contract Between
The Policy Owner And The Company.

# POLICY SCHEDULE

| | | | |
|---|---|---|---|
| Insured: | ROBERT W RUTLEDGE | Policy Number: | 4209668408 |
| Insurance Age: | 51 | Date of Issue: | January 16, 2021 |
| Sex: | Male | Initial Face Amount: | $500,000.00 |
| This Is A Sex Distinct Policy | | Premium Class: | Preferred Non-Tobacco |

## SCHEDULE OF BENEFITS AND PREMIUMS

| Benefits | Benefit Amounts | Annual Premium | Level Premium Period |
|---|---|---|---|
| Life Insurance: | $500,000.00 | $2,099.90* | 30 Years* |
| Terminal Illness Accelerated Death Benefit Rider | | $0.00 | See Rider |
| Chronic Illness Accelerated Death Benefit Rider | | $0.00 | See Rider |
| Critical Illness Accelerated Death Benefit Rider | | $0.00 | See Rider |
| Total Initial Annual Premium: | | $2,099.90 | |

*For Level Premium Period. The Annual Premium shown above includes a policy fee of $75.00. January 16, 2051 is the Termination Date of the Level Premium Period. For future term periods, see the Table of Premiums and Face Amounts.

After the Level Premium Period, this policy may be renewed for Renewal Term Periods of one-year. January 16, 2065 is the Termination Date of the Last Renewal Term Period referred to in the Renewal Option provision.

On the thirtieth policy anniversary and any later policy anniversary, We have the right to change the premium of this policy. See Right to Change Premium provision.

The Face Amount of this policy on each policy year is shown in the Table of Premiums and Face Amounts.

Premiums payable other than annually are equal to a percentage of the Annual Premium and include additional premium charges. These percentages are shown in the Table of Premiums and Face Amounts. The initial Premium Payment Interval is Monthly. The first Monthly premium is $179.54.

Minnesota Insurance Department       Telephone: (651) 539-1500

This Is A Minnesota Policy

**Re-Entry Option.** This policy may be exchanged for a new policy as specified in the Re-Entry Option provision. This option is available only on the thirtieth policy anniversary, provided that a renewable level term policy is made available by Us at the Attained Age of the Insured at re-entry.

**Conversion Option.** This policy may be converted to a new policy as specified in the Conversion Option provision. Conversions are allowed prior to the Conversion Expiry Date. The Conversion Expiry Date is January 16, 2040. The Minimum Face Amount required for this policy after conversion is $100,000.00.

# TABLE OF PREMIUMS AND FACE AMOUNTS

| Policy Year | Maximum* Annual Life Insurance Premium | Face Amount | Policy Year | Maximum* Annual Life Insurance Premium | Face Amount |
|---|---|---|---|---|---|
| 1 | $2,099.90 | $500,000.00 | 23 | $2,099.90 | $500,000.00 |
| 2 | $2,099.90 | $500,000.00 | 24 | $2,099.90 | $500,000.00 |
| 3 | $2,099.90 | $500,000.00 | 25 | $2,099.90 | $500,000.00 |
| 4 | $2,099.90 | $500,000.00 | 26 | $2,099.90 | $500,000.00 |
| 5 | $2,099.90 | $500,000.00 | 27 | $2,099.90 | $500,000.00 |
| 6 | $2,099.90 | $500,000.00 | 28 | $2,099.90 | $500,000.00 |
| 7 | $2,099.90 | $500,000.00 | 29 | $2,099.90 | $500,000.00 |
| 8 | $2,099.90 | $500,000.00 | 30 | $2,099.90 | $500,000.00 |
| 9 | $2,099.90 | $500,000.00 | 31 | $11,378.53 | $56,250.00 |
| 10 | $2,099.90 | $500,000.00 | 32 | $11,378.53 | $56,250.00 |
| 11 | $2,099.90 | $500,000.00 | 33 | $11,378.53 | $56,250.00 |
| 12 | $2,099.90 | $500,000.00 | 34 | $14,910.89 | $56,250.00 |
| 13 | $2,099.90 | $500,000.00 | 35 | $17,136.02 | $56,250.00 |
| 14 | $2,099.90 | $500,000.00 | 36 | $19,729.29 | $56,250.00 |
| 15 | $2,099.90 | $500,000.00 | 37 | $22,729.69 | $56,250.00 |
| 16 | $2,099.90 | $500,000.00 | 38 | $26,153.99 | $56,250.00 |
| 17 | $2,099.90 | $500,000.00 | 39 | $29,902.55 | $56,250.00 |
| 18 | $2,099.90 | $500,000.00 | 40 | $33,935.87 | $56,250.00 |
| 19 | $2,099.90 | $500,000.00 | 41 | $38,218.82 | $56,250.00 |
| 20 | $2,099.90 | $500,000.00 | 42 | $42,561.14 | $56,250.00 |
| 21 | $2,099.90 | $500,000.00 | 43 | $46,922.53 | $56,250.00 |
| 22 | $2,099.90 | $500,000.00 | 44 | $51,089.25 | $56,250.00 |

*See Right To Change Premium provision.

Premiums payable other than annually are computed by multiplying the applicable Annual Premium by the Premium Percentages shown below.

| Premium Payment Interval | Premium Percentage |
|---|---|
| Semi-annual: | 52.00% |
| Quarterly: | 26.50% |
| Monthly (Pre-authorized checking): | 8.55% |

**Contract.** Your policy is a legal contract that You have entered into with Us. You have paid the first premium and have submitted an application, a copy of which is attached. In return, We promise to provide the insurance coverage described in this policy.

The entire contract consists of:

1. This policy; and

2. The attached riders, if any, that add benefits to this policy; and

3. The attached endorsements, if any; and

4. The attached copy of Your application, and any attached amendments or attached supplemental applications.

**Date of Issue.** The Date of Issue of this policy is the date on which the first premium is due. The Date of Issue is also the date from which all policy years and anniversaries are determined.

**Owner.** The Owner is as stated in the application unless later changed. During the Insured's lifetime, the Owner may exercise every right this policy confers or We allow (subject to the rights of any assignee of record or irrevocable beneficiary). You may have multiple Owners of this policy. In that case, the authorizations of all Owners are required in Writing for all policy changes. The Owner may be the same as the Insured but does not have to be. If an Owner dies while this policy is in force and the Insured is living, ownership rights pass to the successor Owner documented in Our records, if any; otherwise ownership rights pass to the estate of the Owner.

## PREMIUM PAYMENTS

**Premium Payment.** The first premium is due on the Date of Issue. Subsequent premiums for each Renewal Term Period are due on the first day of each Premium Payment Interval shown on the Policy Schedule. Each premium must be paid on or before its due date.

You may change the Premium Payment Interval for this policy, subject to Our rules at the time of change.

**Where to Pay.** You may make Your payments to Us at Our Administrative Center or to an agent authorized by Us to receive such payment. All premium checks must be made payable to the Company. A receipt signed by an officer of the Company will be furnished upon request.

**Annual Life Insurance Premium.** The Maximum Annual Life Insurance Premium is shown in the Table of Premiums and Face Amounts. We may charge an annual premium lower than the Maximum Annual Life Insurance Premium. No annual premium charge can be higher than the Maximum Annual Life Insurance Premium.

**Right To Change Premium.** We reserve the right to change the premium for this policy on the policy anniversary shown on the Policy Schedule and on any later policy anniversary, subject to the following terms:

1. The Annual Premium will not exceed the applicable Maximum Annual Life Insurance Premium shown in the Table of Premiums and Face Amounts.

2. Any change in premium for this policy will apply to all Insureds with the same policy benefits and provisions and with the same Date of Issue, Age at issue, Sex (if this policy was issued on a Sex Distinct basis) and Premium Class. We will not change the premium because of a change in an Insured's health, occupation or avocation.

3. Any change in premium for this policy will take effect only after 30 days prior notice has been given to the Owner of this policy.

4. Any change in premium for this policy will be based upon factors and considerations including, but not limited to, Our future expectations as to mortality, persistency, expenses, reinsurance costs, and any local, state and federal taxes. We will not change the premium in order to recoup any prior losses.

# PREMIUM PAYMENTS (Cont'd)

5. Any change in premium for this policy will be determined in accordance with procedures and standards on file with the Interstate Insurance Product Regulation Commission.

This provision does not apply to any rider attached to this policy.

**Grace Period.** The Grace Period is the 31-day period that follows the due date of any premium other than the first premium.

Any payments sent by U.S. mail must be postmarked within the Grace Period in order to keep Your policy in force. If the amount of premium required to keep Your policy in force is not paid by the end of the Grace Period, this policy will terminate.

# CHANGE IN FACE AMOUNT

The Face Amount of this Policy will change after the Level Premium Period. The Face Amount of this Policy on each policy year is shown in the Table of Premiums and Face Amounts.

# DEATH BENEFIT

If the Insured dies before this policy's Termination Date shown on the Policy Schedule and while this policy is in force, We will pay the Death Benefit to the Beneficiary after We receive Due Proof of Death and proper written claim showing proof of the claimant's interest in the Death Benefit.

The Death Benefit will be equal to:

1. The Face Amount of the policy in the current policy year plus;

2. Any insurance on the Insured's life that is payable under any attached riders; less

3. Any premium amount due if the Insured's death occurs during the Grace Period; plus

4. Any part of a premium paid for coverage beyond the policy month in which the Insured dies; plus

5. Any interest as described in the Interest Payable on Death Benefit provision.

# BENEFICIARY AND PROCEEDS

**Beneficiary.** The Beneficiary as named in the application, or later changed by You, will receive the proceeds upon the death of the Insured. Unless You have stated otherwise, proceeds will be paid as follows:

1. If any Beneficiary dies while the Insured is living, that Beneficiary's interest will pass to any other Beneficiaries of the Insured We determine are entitled to payment; or

2. If there is no Beneficiary upon the death of the Insured (and there is no provision to the contrary), proceeds will be paid in one lump sum to the Owner, if living; otherwise proceeds will be paid to the Owner's estate.

## BENEFICIARY AND PROCEEDS (Cont'd)

**Common Disaster.** If We cannot determine whether a Beneficiary or the Insured died first in a common disaster, We will assume that the Beneficiary died first. Proceeds will be paid on this basis unless We receive Your Written request prior to the death of the Insured that provides otherwise.

**Proceeds.** Proceeds mean the amount payable on the Insured's death.

The proceeds payable on the Insured's death will be the Death Benefit, after refunding any premium received on or after the date of death and will be subject to the other provisions of the Beneficiary and Proceeds section.

All proceeds are subject to the provisions of the Payment Options section and the other provisions of this policy. Full payment of policy proceeds to the person(s) designated to receive such policy proceeds discharges Us from all claims.

**Due Proof of Death.** Due Proof of Death means any written proof which includes a copy of the death certificate or other lawful evidence providing equivalent information.

## CHANGE OF OWNERSHIP OR BENEFICIARY

You may change the Owner or the Beneficiary at any time during the lifetime of the Insured unless the previous designation provides otherwise. However, an irrevocable beneficiary cannot be changed without the written consent of such irrevocable beneficiary. To do so, send a Written request to Our Administrative Center. The change

will go into effect when We have received the change. However, after the change is received, it will be deemed effective as of the date You signed the Written request for change, unless You specify otherwise. The change will be subject to any payment made or action taken by Us before We receive the request.

## PAYMENT OPTIONS

Proceeds are payable in one sum. Instead of being paid in one sum, all or part of the proceeds may be applied under any of the Payment Options described below. In addition to these options, other methods of payment may be chosen with Our consent. The amount applied to purchase a Payment Option will not be less than would be provided by immediate annuity purchase rates offered by the Company at the time the Payment Option payments are to begin.

The monthly payment for each $1,000 of proceeds applied to purchase a Payment Option will be furnished upon request.

**Payment Contract.** When proceeds become payable under a Payment Option, a Payment Contract will be issued to each payee. The Payment Contract will state the rights and benefits of the payee. It will also name those who are to receive any balance unpaid at the death of the payee.

# PAYMENT OPTIONS (Cont'd)

**Election of Options.** The Owner may elect or change any Payment Option while the Insured is living, subject to the provisions of this policy. This election or change must be In Writing. Within 60 days after the Insured's death, a payee entitled to proceeds in one sum may elect to receive proceeds under any option, subject to the limitations stated in the "Availability of Options" provision.

**Option 1. Payments for a Specified Period:** Equal monthly payments will be made for a specified period.

**Option 2. Payments of a Specified Amount:** Equal monthly payments of a specified amount will be made. If You select this Payment Option each payment must be at least $60 a year for each $1,000 of proceeds applied. Payments will continue until the amount applied, with interest, has been paid in full.

**Option 3. Payments for Life with Period Certain:** Equal monthly payments will be made for a specified period, and will continue after that period for as long as the payee lives. The specified period may be 10, 15 or 20 years. If issued on a Sex Distinct basis, payments are calculated based on the Annuity 2000 Male or Female Tables adjusted by projection scale G (adjusted by 50% of projection scale G for females and 100% of projection scale G for males) for 20 years. If issued on a Unisex basis, payments are calculated based on the Annuity 2000 Male and Female Tables adjusted by projection scale G (adjusted by 50% of projection scale G for females and 100% of projection scale G for males) for 20 years, with Unisex rates based on 40% female and 60% male.

**Option 4. Proceeds Left at Interest:** Proceeds may be left on deposit for any period up to 30 years. Interest earned on the proceeds may be:

1. Left on deposit to accumulate with interest; or

2. Paid in installments at the rate for each $1,000 of proceeds of $10.00 annually, $4.99 semiannually, $2.49 quarterly or $0.83 monthly.

Upon the death of the payee, or at the end of the specified period, any balance left on deposit will be paid in a lump sum or under Options 1, 2 or 3.

**Interest Rates.** Proceeds held under all Payment Options receive interest at Our current rate for funds left on deposit, which will be no less than the guaranteed rate. The guaranteed rate of interest for proceeds held under all Payment Options is 1.00% compounded annually. We may use a higher rate of interest. We determine the higher rate.

**Payments.** The first payment under Options 1, 2 and 3 will be made when the claim for settlement has been approved. Payments after the first will be made according to the manner of payment chosen. Interest under Option 4 will be credited from the date of death and paid or added to the proceeds as provided in the Payment Contract.

**Availability of Options.** If the proposed payee is not a natural person, payment options may be chosen only with Our consent.

If this policy is assigned, We will have the right to pay the assignee in one sum the amount to which the assignee is entitled. Any balance will be applied according to the option chosen.

The amount to be applied under any one option must be at least $2,000. The payment elected under any one option must be at least $20. If the total policy proceeds are less than $2,000, payment will be made in one lump sum.

**Evidence That Payee is Alive.** Before making any payment under a Payment Option, We may ask for proof that the payee is alive. If proof is requested, no payment will be made or considered due until We receive proof.

# PAYMENT OPTIONS (Cont'd)

**Death of a Payee.** If a payee dies, any unpaid balance will be paid as stated in the Payment Contract. If there is no surviving payee named in the Payment Contract, We will pay the estate of the payee:

1. Under Options 1 and 3: The value of the remaining payments for the specified period as of the date We receive Written notification of death, discounted at the rate of interest used in determining the amount of the monthly payment.

2. Under Options 2 and 4: The balance of any proceeds remaining unpaid with accrued interest, if any.

**Withdrawal of Proceeds Under Options 1 and 2.** If provided in the Payment Contract, a payee will have the right to withdraw the entire unpaid balance under Options 1 and 2. Under Option 1, the amount will be the value of the remaining payments for the specified period discounted at the rate of interest used in determining monthly income. Under Option 2, the amount will be the entire unpaid balance.

**Withdrawal of Proceeds Under Option 4.** A payee will have the right to withdraw proceeds left under Option 4 subject to the following rules:

1. The amount to be withdrawn must be $500 or more; and

2. A partial withdrawal must leave a balance on deposit of $1,000 or more.

**Withdrawals May Be Deferred.** We may defer payment of any withdrawal for up to 6 months from the date We receive a withdrawal request.

**Assignment.** Payment Contracts may not be assigned.

**Change in Payment.** The right to make any change in Your manner of payment is available only if the Payment Contract provides for a change in payment.

**Claims of Creditors.** To the extent permitted by law, proceeds will not be subject to any claims of a payee or a Beneficiary's creditors.

# GENERAL PROVISIONS

**Changing the Terms of Your Policy.** Any change in Your policy must be approved in writing by the President, a Vice President, an Administrative Officer or the Secretary of the Company. No agent has the authority to make any changes or waive any of the terms of Your policy.

**Assigning Your Policy.** During the lifetime of the Insured, unless restricted by federal tax law, You may assign this policy as security for an obligation. We will not be bound by an assignment unless it is received In Writing at Our Administrative Center. Your rights and those of any other person referred to in this policy will be subject to the assignment. The assignment, unless You specify otherwise, will

take effect on the date that You signed the notice of assignment, subject to any payments made or actions taken by Us before We receive such assignment. We will not be responsible for the validity or tax consequences of any assignment.

**Incontestability.** We rely on the statements made in the application for this policy and any amendments of applications, supplemental applications, and applications for any reinstatements. These statements, in the absence of fraud, are considered representations and not warranties. No statement may be used in defense of a claim under this policy unless it is in such applications attached to this policy.

We cannot contest this policy after it has been in force during the Insured's lifetime for two years from the Date of Issue. If this policy is reinstated, We cannot contest this policy during the Insured's lifetime after it has been in force for two years from the date of such reinstatement.

Exceptions:

We can contest a reinstatement for a two-year period following the date of such reinstatement solely on the basis of the information furnished in the application for such reinstatement.

If all or part of this policy is converted to a new policy before the two-year contestable period has expired, the remaining contestable period will apply to the amount of death benefit under the new policy attributable to the part of this policy that was converted.

The two-year contestable limitation does not apply to benefits provided by any disability or accidental death benefit rider, or to the nonpayment of premium.

**Suicide Exclusion.** If the Insured takes his or her own life, while sane or insane, within two years from the Date of Issue or the date We approve Your reinstatement application, We will limit the Death Benefit to the premiums paid. If all or part of this policy is converted to a new policy, the remaining part of the original two year suicide exclusion on this policy will apply to the new policy.

**Age or Sex Incorrectly Stated (Age Incorrectly Stated if Issued on a Unisex Basis).** If the: (1) age or sex of the Insured (if this policy was issued on a Sex Distinct basis); or (2) age of the Insured (if this policy was issued on a Unisex basis) has been misstated to Us, We will adjust the Death Benefit on the date of death to that which the most recent premium paid would have purchased.

**Conformity With Interstate Insurance Product Regulation Commission Standards.** This policy was approved under the authority of the Interstate Insurance Product Regulation Commission and issued under the Commission Standards. Any provision of this policy that is in conflict with Interstate Insurance Product Regulation Commission Standards for this product type is hereby amended to conform to the Interstate Insurance Product Regulation Commission Standards for this product type as of the provision's effective date.

**No Dividends.** This policy will not pay dividends. It will not participate in any of Our surplus or earnings.

**When This Policy Terminates.** This policy will terminate on the earliest of:

1. Any date on which You request that this policy be terminated; or

2. The date on which the Insured dies; or

3. The date on which the Grace Period ends; or

4. The Termination Date of the Last Renewal Term Period shown on the Policy Schedule; or

5. The date on which the current term period terminates if this policy is not renewed for a subsequent term period; or

6. The date on which this policy is wholly replaced by a new policy issued by Us.

**Reinstatement.** "Reinstating" means placing Your policy in force after it has terminated at the end of the Grace Period. We will reinstate this policy if We receive:

1. Your Written request within five years after the end of the Grace Period and before the Termination Date of the Last Renewal Term Period; and

2. Evidence of insurability satisfactory to Us; and

3. Payment of the premium for the Grace Period with interest at the rate of 6% per year compounded annually plus the premium due for the current policy month.

If a person other than the Insured is covered by an attached rider, coverage will be reinstated according to that rider.

**Rights Reserved By Us.** Upon notice to You, this policy may be modified by Us, if such modification is necessary as required by the Internal Revenue Code or by any other applicable law, regulation or interpretation in order to continue treatment of this policy as life insurance.

When required by law, We will obtain Your approval of changes and We will obtain approval from any appropriate regulatory authority.

**Correspondence.** Any request, notice or proof shall be filed with Our Administrative Center.

**Policy Settlement.** In any settlement, We may require the return of this policy.

**Interest Payable on Death Benefit.** Interest is paid on the Death Benefit as follows:

1. Interest will accrue and be payable from the date of death.

2. Interest will accrue at the rate or rates applicable to this policy for funds left on deposit. In determining the effective annual rate or rates, We will use the rate in effect on the date of death.

3. Interest will accrue at the effective annual rate determined in item 2 above, plus additional interest at a rate of 10% annually beginning with the date that is 31 calendar days from the latest of items a, b and c below to the date the claim is paid, where it is:

   a. The date that Due Proof of Death is received by the Company;

   b. The date the Company receives sufficient information to determine its liability, the extent of the liability, and the appropriate payee legally entitled to the proceeds; and

   c. The date that legal impediments to payment of proceeds that depend on the action of parties other than the Company are resolved and sufficient evidence of the same is provided to the Company. Legal impediments to payment include, but are not limited to: (1) the establishment of guardianships and conservatorships; (2) the appointment and qualification of trustees, executors and administrators; and (3) the submission of information required to satisfy any state and federal reporting requirements.

## RE-ENTRY OPTION

If a renewable level term policy is made available by Us at the Attained Age of the Insured at re-entry, then this option will be available.

This option is available only on the policy Anniversary shown on the Policy Schedule. We agree to exchange this policy for a new renewable level term life insurance policy on the life of the Insured. We will require evidence of insurability satisfactory to Us. Such evidence will be paid for by Us and will be based on Our then current underwriting rules.

Exchange will be subject to the following conditions:

1. A properly completed application must be submitted to Us within 60 days prior to the date of exchange, along with payment of the initial premium for the new policy.

2. This policy must be in force and all premiums due prior to the date of exchange must be paid. Insurance under this policy will cease when this policy is exchanged.

3. The Age at issue for the new policy will be the Attained Age of the Insured under this policy on the date of exchange.

4. The new policy will be on the same plan of insurance as this policy or, if such plan is not available, on a plan of insurance made available by Us that We determine to be reasonably similar to this plan. Alternatively, the Owner may elect any other plan, if available, with a shorter renewable term period then being issued on this policy form. The Date of Issue of the new policy will be the date of exchange. The Face Amount of the new policy may not exceed the Initial Face Amount of this policy and must meet or exceed the minimum then in effect for the plan elected.

5. Any benefits or riders in force under this policy on the date of exchange will be included in the new policy and will be subject to Our then current rules and rates.

6. The new policy, excluding any accidental death rider, will not have a suicide exclusion provision.

7. The contestable period of the new policy will start on the date of exchange, with respect to the evidence of insurability used to qualify the Insured for the new policy. However, We may contest only the difference between the face amount of the new policy and the face amount that the premium for the new policy, excluding the premium for any riders, would have purchased on the date of exchange had this policy remained in force.

8. The premium rates for the new policy will be Our then current rates applicable to a new purchase of the plan elected.

## CONVERSION AND RENEWAL PROVISIONS

**Conversion Option.** We agree to convert all or part of this policy to a new policy on the life of the Insured. We will not require evidence of insurability.

You must submit a written application and pay the first premium for the new policy:

1. While the Insured is alive;

2. While this policy is in force; and

3. Before the Conversion Expiry Date for this policy shown on the Policy Schedule.

You must submit this policy for cancellation.

However, if You convert less than the Face Amount of this policy in the current policy year, You may continue the unconverted Face Amount under this policy if it is at least as much as the Minimum Face Amount shown on the Policy Schedule. The premiums for this policy thereafter will be the same as the premiums that would be payable if it had been originally issued for the unconverted Face Amount.

**New Policy.** You may select the plan and amount of insurance for the new policy. The plan must be:

1. A permanent individual life insurance plan;

2. A plan that is then regularly issued at the Insured's Attained Age, Premium Class of the new policy and for the amount of insurance selected; and

3. Issued by Us or by one of Our affiliated companies and made available to Our policyowners for conversion purposes.

You may elect from all policies made available by Us for conversion purposes, whether issued by Us or by one of Our affiliated companies, the policy to which You wish to convert.

The amount of insurance cannot be more than the Face Amount of this policy in the current policy year or less than the minimum face amount for the plan selected.

The premium for the new policy will be determined by Our published rates, or by the published rates of Our affiliated company if You convert to such a company's available plan, for the Insured's Attained Age and the Premium Class of the new policy.

The Premium Class of the new policy will be the same as the Premium Class of this policy. If the plan and amount selected are not available in that Premium Class at the Insured's Attained Age, the Premium Class will be the Premium Class which We, or Our affiliated company if applicable, determine to be the most nearly comparable.

The suicide and contestable periods of the new policy will be measured from the Date of Issue of this policy.

The new policy will not include any riders unless agreed to by Us or Our affiliated company, if applicable.

**Renewal Option**. If this policy is in force on the Termination Date for the Level Premium Period, You may renew it for a Renewal Term Period of one year. If this policy is in force on the termination date for each subsequent Renewal Term Period, You may renew it for similar successive Renewal Term Periods of one year until the Termination Date of the Last Renewal Term Period shown on the Policy Schedule. Any renewal of this policy will be effective as of the renewal date if the first renewal premium is paid on such date or within a Grace Period of 31 days thereafter.

The amount of the premium payable during each Renewal Term Period is shown in the Table of Premiums and Face Amounts.

We will automatically renew this policy on any renewal date if premiums for this policy are being waived for total disability. We will continue to waive premiums during the Renewal Term Period, subject to the terms of a waiver of premium rider.

THIS PAGE IS INTENTIONALLY LEFT BLANK

# ENDORSEMENT

**Insured:**          ROBERT W RUTLEDGE
**Policy Number:**    4209668408
**Maximum Acceleratable Coverage:**    $500,000.00

This Endorsement is made a part of the Policy to which it is attached.

**Maximum Acceleratable Coverage** means the portion of the Face Amount or the Specified Amount, as the case may be, that You are potentially able to accelerate under one or more accelerated benefit riders attached to this Policy. See the Policy Schedule for all accelerated benefit riders attached to Your Policy.

Except as otherwise limited by operation of any other provisions of this or any other policy, You may reduce the accelerated life insurance amount of any accelerated benefit rider as to any Insured Person under this Policy and create within another life insurance policy on the life of such Insured Person, issued by Us and owned by You, a new accelerated benefit rider made available by Us having the same accelerated life insurance amount and Effective Date.

In addition, except as otherwise limited by operation of any other provisions of this or any other Policy, You may reduce the accelerated life insurance amount of any accelerated benefit rider as to any Insured Person under another life insurance policy issued by Us and owned by You and create within the Policy a new accelerated benefit rider made available by Us for such Insured Person having the same accelerated life insurance amount and Effective Date.

In no case may the amount of life insurance that may be accelerated exceed the Maximum Acceleratable Coverage.

The Effective Date of this Endorsement is January 16, 2021.

**AMERICAN GENERAL LIFE INSURANCE COMPANY**

*K Hogan*

President

## TERMINAL ILLNESS ACCELERATED DEATH BENEFIT RIDER
Provides for Election to Accelerate a Portion of the Policy Amount

This rider is issued as part of the Policy to which it is attached.

ANY BENEFIT PAID UNDER THIS RIDER WILL IMPACT THE POLICY. THE POLICY AMOUNT, CASH VALUE AND LOAN VALUE WILL BE REDUCED IF AN ACCELERATED DEATH BENEFIT IS PAID. THE IMPACT ON THE POLICY IS DISCUSSED IN THE IMPACT ON POLICY PROVISION OF THIS RIDER. YOU SHOULD CONTACT YOUR PERSONAL TAX ADVISOR FOR SPECIFIC ADVICE BEFORE EXERCISING ANY RIGHTS UNDER THIS RIDER. PAYMENTS RECEIVED UNDER THIS TERMINAL ILLNESS ACCELERATED DEATH BENEFIT RIDER ARE NOT PART OF A HEALTH, LONG TERM CARE, OR NURSING HOME INSURANCE POLICY AND MAY NOT BE SUFFICIENT TO COVER MEDICAL, NURSING HOME OR OTHER BILLS.

ALL PROVISIONS OF THE POLICY THAT DO NOT CONFLICT WITH THIS RIDER APPLY TO THIS RIDER. WHERE THERE IS ANY CONFLICT BETWEEN THE RIDER PROVISIONS AND THE POLICY PROVISIONS, THE RIDER PROVISIONS PREVAIL.

# DEFINITIONS

Capitalized terms not defined in this rider will have the meaning given in the Policy.

**Accelerated Benefit.** The term "Accelerated Benefit" means the Terminal Illness Accelerated Death Benefit Amount paid to the Owner during the Insured Person's lifetime.

**Accelerated Benefit Payment Date.** The term "Accelerated Benefit Payment Date" means the date an Accelerated Benefit is paid. This date will be no later than 31 days following the satisfaction of all applicable provisions and requirements under this rider and the Policy with respect to a claim.

**Certified/Certification.** The term "Certified/Certification" means a written definitive determination of an Insured Person's Qualifying Terminal Illness signed by a Physician in support of a claim under this rider. The results of the Certification must be documented in and supported by the Insured Person's medical records and provided to Us.

**Covered Rider**. The term "Covered Rider" means any benefit rider identified on the Rider Schedule as eligible for acceleration under an accelerated benefit rider.

**Terminal Illness Accelerated Death Benefit Amount.** The term "Terminal Illness Accelerated Death Benefit Amount" means as to any Qualifying Terminal Illness:

1. The maximum dollar amount that We determine can be payable with respect to a claim under this rider to the Owner upon satisfaction of all applicable provisions and requirements under this rider and the Policy; or

2. Any lesser amount elected by the Owner to be received under this rider. The Terminal Illness Accelerated Death Benefit Amount for a Qualifying Terminal Illness will never be less than the applicable Minimum Accelerated Benefit Amount for such Qualifying Terminal Illness.

**Diagnosed/Diagnosis.** The term "Diagnosed/Diagnosis" means a written definitive Diagnosis of an Insured Person's Qualifying Terminal Illness signed by a Physician. It must be based upon the use of diagnostic evaluations, clinical and/or laboratory investigations, tests and observations that follow recommended and accepted medical practices, the results of which must be documented in and supported by the Insured Person's medical records and provided to Us.

**Death Benefit You Elect to Accelerate.** The term "Death Benefit You Elect to Accelerate" means the portion of the Policy Amount that the Owner elects to accelerate on a given Accelerated Benefit Payment Date. It may not exceed the Maximum Death Benefit You Can Accelerate determined in accordance with the Maximum Death Benefit You Can Accelerate provision of this rider. It may not reduce the Policy Amount below the minimum amount under Our then-current rules.

**Immediate Family Member.** The term "Immediate Family Member" means Your or the Insured Person's:

1. Spouse; or

2. Parents; or

3. Brothers and sisters; or

4. Children by blood, adoption or marriage; or

5. The spouse of any person listed in items 2, 3 or 4 above.

**Insured Person.** The term "Insured Person" means the person named as Insured in the Policy and/or person(s) insured under a Covered Rider.

**Physician.** The term "Physician" (as defined in section 1861(r)(1) of the Social Security Act) means a doctor of medicine or osteopathy legally authorized to practice medicine or surgery by the State in which he or she performs such function or action. Physician does NOT mean:

1. You; or

2. The Insured Person; or

3. A person who lives with You or the Insured Person; or

4. A person who is an Immediate Family Member.

**Policy.** The term "Policy" means the Policy to which this rider is attached.

**Policy Amount.** The term "Policy Amount" means the amount of insurance coverage for the Insured Person under the Policy and/or any other Covered Rider. Policy Amount does not include the amount of insurance under any other rider(s) attached to the Policy.

**Qualifying Terminal Illness.**  The term "Qualifying Terminal Illness" means an illness or condition which a Physician has Diagnosed and reasonably expects to result in the Insured Person's death with 24 months or less from the date of Diagnosis.

**State.**  The term "State" means one of the United States (U.S.) states, plus the District of Columbia, and including Guam, the U.S. Virgin Islands and Puerto Rico.

## BENEFITS

**Benefit Eligibility Under This Rider.**  Subject to the terms of this rider, You are eligible to elect to accelerate a portion of the Policy Amount if:

1.  The Insured Person is Diagnosed with and is Certified as having a Qualifying Terminal Illness while such Insured Person's coverage under this rider is in force; and

2.  You satisfy the requirements of the Filing An Accelerated Benefit Claim provision.

**Terminal Illness Accelerated Death Benefit Amount.**  We will determine the Terminal Illness Accelerated Death Benefit Amount as of the Accelerated Benefit Payment Date, after You file a claim for Accelerated Benefits for an Insured Person under this rider.

The Terminal Illness Accelerated Death Benefit Amount will be equal to the Death Benefit You Elect to Accelerate, less the following deductions:

1.  The actuarial discount determined by Us; and

2.  An administrative charge, not to exceed the Maximum Administrative Charge shown on the Rider Schedule; and

3.  Payment of any unpaid but due Policy premiums up to the Accelerated Benefit Payment Date; and

4.  If applicable, payment of a pro rata amount of any Policy loans.

As a result of these deductions, the Terminal Illness Accelerated Death Benefit Amount will in all cases be less than the Death Benefit You Elect to Accelerate, and may be substantially less but not less than the applicable Minimum Accelerated Benefit Amount.  Election of the Terminal Illness Accelerated Death Benefit Amount and payment of an Accelerated Benefit will, however, reduce the Policy Amount by the full amount of the Death Benefit You Elect to Accelerate as discussed in the Impact On Policy provision.

We will determine the actuarial discount applicable to the Death Benefit You Elect to Accelerate using factors including, but not limited to, the following:

1.  The Accumulation Value and Cash Surrender Value, if any, under the Policy; and

2.  The future premiums or charges payable under the Policy; and

3.  Our assessment of the expected future mortality of the Insured Person; and

4. An interest rate that will not exceed the greater of the yield on 90-day U.S. Treasury Bills or the statutory adjustable Policy loan interest rate on the Accelerated Benefit Payment Date.

If the source of the interest rate used in determining the Death Benefit You Elect to Accelerate is discontinued, We will use an appropriate substitute and comparable interest rate, subject to the approval by the Interstate Insurance Product Regulation Commission (IIPRC).

We will pay each Terminal Illness Accelerated Death Benefit Amount in a lump sum.

Accelerated Benefits are paid to You, or Your estate, prior to the death of the Insured Person. The Accelerated Benefit payments may be used for any purpose.

**Minimum Accelerated Benefit Amount.** The Minimum Accelerated Benefit Amount will be the greater of:

1. The applicable Minimum Accelerated Benefit Percentage shown on the Rider Schedule multiplied by the Death Benefit You Elect to Accelerate, which is then reduced by the following deductions:

   a. Payment of any unpaid but due Policy premiums up to the Accelerated Benefit Payment Date; and

   b. If applicable, payment of a pro rata amount of any Policy loans; or

2. The pro rata portion of the Cash Surrender Value, if any, which corresponds to the Death Benefit You Elect to Accelerate.

**It is possible that the Minimum Accelerated Benefit Amount as calculated above may be zero.**

**Maximum Death Benefit You Can Accelerate.** The Maximum Death Benefit You Can Accelerate as to an Insured Person under this rider is the lesser of:

1. The then-current Policy Amount; or

2. The Maximum Death Benefit You Can Accelerate shown on the Rider Schedule.

We reserve the right to limit the Maximum Death Benefit You Can Accelerate to ensure that the Policy Amount after an Accelerated Benefit is paid is not less than the minimum amount required to qualify as life insurance under applicable tax laws.

We will recalculate the Maximum Death Benefit You Can Accelerate each time a benefit is paid under any accelerated death benefit rider attached to the Policy. We will provide the new Maximum Death Benefit You Can Accelerate in an endorsement to the Policy.

**Impact of Changes in the Specified Amount.** If the Specified Amount of the Policy is increased under the terms of the Policy, the Maximum Death Benefit You Can Accelerate may be increased. We will require an application and evidence of insurability satisfactory to Us for any increase in the Maximum Death Benefit You Can Accelerate.

If the Specified Amount of the Policy is reduced, the Maximum Death Benefit You Can Accelerate may be reduced.

**Impact On Policy.** The following adjustments are made upon payment of the Accelerated Benefit for an Insured Person on a given Accelerated Benefit Payment Date:

1. The Insured Person's Policy Amount under the Policy and/or any Covered Riders will be reduced by the Death Benefit You Elect to Accelerate (not the Terminal Illness Accelerated Death Benefit Amount); and

2. The Maximum Death Benefit You Can Accelerate will be recalculated; and

3. If applicable, the Surrender Charges, Accumulation Value, Cash Surrender Value, cash value, any Policy loans and any Continuation Guarantee Account are reduced in the same proportion as the reduction in the Insured Person's Policy Amount; and

4. The future premiums and charges for the Insured Person's life insurance under the Policy and/or any Covered Riders are set as if such insurance had been originally issued at the reduced Policy Amount.

The Insured Person's life insurance under the Policy and/or any Covered Riders will terminate on the Accelerated Benefit Payment Date if the Policy Amount for such insurance is reduced to zero.

## CLAIMS

**Claims.** A written request for benefits must be submitted to Us. Upon receipt of the request, We will mail a claim form to You within 15 working days. If the claim form is not sent within this 15-day period, and You provide proof satisfactory to Us that the Insured Person has a Qualifying Terminal Illness in a format other than Our claim form, You will be deemed to have complied with the claim requirement. Required proof includes, but is not limited to, a Certification signed by a Physician certifying that the Insured Person has been Diagnosed with a Qualifying Terminal Illness, and complete records of the Insured Person's medical history, Diagnosis and treatments.

**Filing An Accelerated Benefit Claim.** To begin the claim process under this rider, You must provide the following items:

1. A completed claim form and then-current Certification received by Us at Our claim office; and

2. The written consent, on a form provided by Us, of any irrevocable Beneficiary, assignee or other required party to Your election of an Accelerated Benefit under this rider.

The failure to provide a required claim form (with the requested attachments) within the period set forth in this rider may preclude payment of a benefit.

Regarding a Diagnosis, We reserve the right to obtain a second medical opinion from a Physician and/or additional medical records of an Insured Person at Our expense. In the event of conflicting opinions, Diagnosis of a Qualifying Terminal Illness shall be determined by a third medical opinion, at Our expense, from a Physician who is mutually acceptable to both You and Us.

If We determine that the conditions for payment of an Accelerated Benefit have been met, We will notify You of the Terminal Illness Accelerated Death Benefit Amount that You may elect, if any, for a Qualifying Terminal Illness and We will send You an election form. You must complete the election form and return it to Us within the Election Period shown on the Rider Schedule. The failure to provide the required election form (with the requested attachments) within the Election Period may preclude payment of a benefit and may require You to file a new claim as to the Qualifying Terminal Illness. You may choose either to elect or not to elect a Terminal Illness Accelerated Death Benefit Amount that will be paid as an Accelerated Benefit for such Qualifying Terminal Illness. Payment of any Terminal Illness Accelerated Death Benefit Amount as an Accelerated Benefit is due immediately upon Our receipt of Your election form in which You have elected a Terminal Illness Accelerated Death Benefit Amount

## GENERAL PROVISIONS

**Limitations.** You are not eligible to elect a Terminal Illness Accelerated Death Benefit Amount or receive an Accelerated Benefit under this rider if:

1. You are required by law to use this rider to meet the claims of creditors, whether in bankruptcy or otherwise; or

2. You are required by a government agency to use this rider to apply for, obtain or keep a government benefit or entitlement; or

3. You are required by a court order to maintain such Insured Person's life insurance coverage under the Policy and/or any Covered Riders for another person's benefit; or

4. Any Qualifying Terminal Illness results directly from the Insured Person's self-inflicted injury or attempted suicide, while sane or insane; or

5. The consent of any irrevocable Beneficiary, assignee or other required party to Your election of an Accelerated Benefit has not been obtained; or

6. The Insured Person dies after You elect to receive a Terminal Illness Accelerated Death Benefit Amount and before We pay an Accelerated Benefit. Such election will be voided and the Policy's Death Benefit or Death Benefit Proceeds, as the case may be, will be payable. For purposes of this provision, such payment shall be deemed to have occurred if We have placed a check containing the Accelerated Benefit in the U.S. mail, placed a check containing the Accelerated Benefit in the hands of a recognized overnight delivery service for delivery or established a retained asset account at the Owner's direction.

**Effects Of Accelerated Benefit Payments.** You should consider that receiving or being eligible to receive an Accelerated Benefit may affect Your eligibility for Medicaid, Supplemental Security Income (SSI), or other government benefits or entitlements. **Contact the Medicaid Unit of Your local Department of Public Welfare and the Social Security Administration for more information. If You begin a claim during the contestability period of the Policy or of a reinstatement of the Policy, the entire Policy may be rescinded if there is any material misrepresentation of information provided in the application for the Policy or in any applicable reinstatement application.**

**Report To Owner.** Upon the election of a Terminal Illness Accelerated Death Benefit Amount and payment of any Accelerated Benefit, We will provide You, and any irrevocable beneficiary, with a statement which outlines the effect of the Accelerated Benefit payment on the Policy as described in the Impact On Policy provision.

**Not Contestable After Two Years.** We will not contest an Insured Person's coverage under this rider after such coverage has been in force during such Insured Person's lifetime for two (2) years from the Rider Date of Issue or the date of last reinstatement of such Insured Person's coverage under this rider, whichever occurs last, except We may contest such Insured Person's coverage under this rider for any claim for a Qualifying Terminal Illness that was Diagnosed or Certified before the end of such two-year period.

**Suicide Exclusion.** If You exercise Your right to elect a Terminal Illness Accelerated Death Benefit Amount and the Policy does not terminate and the Insured Person subsequently commits suicide, while sane or insane, within two (2) years from the Rider Date of Issue or the date We approve Your reinstatement application, the Death Benefit under the Policy will be that described in the Suicide Exclusion provision of the Policy less any Accelerated Benefit payments and accrued interest, and may be zero.

**Reinstatement.** If the Policy and this rider are terminated, and the Policy is reinstated, then this rider will also be reinstated, subject to submission of evidence of insurability satisfactory to Us.

**Termination**. If more than one person has coverage under this rider, coverage for each Insured Person under this rider will terminate on the earliest of:

1. The date on which You elect to accelerate the entire Maximum Death Benefit You Can Accelerate in force for such Insured Person under the Policy and/or any Covered Riders; or

2. The date on which such Insured Person's life insurance coverage under the Policy and/or any Covered Riders terminates; or

3. Any date requested by You in writing; or

4. The date this rider terminates.

This rider will terminate on the earliest of:

1. The date on which You elect to accelerate the entire Maximum Death Benefit You Can Accelerate in force for all Insured Persons covered under this rider; or

2. The date the Policy terminates; or

3. Any date requested by You in writing.

Termination of this rider will not preclude the payment of benefits if the covered loss is sustained and all of the conditions in the Benefit Eligibility Under This Rider provision are met while this rider is in force.

**Policy Provisions Applicable.** This rider is subject to all the conditions and provisions of the Policy to which it is attached, except as provided herein. In the event of a conflict, the provisions of this rider will prevail.

The effective date of this rider is the Rider Date of Issue.

President

© American International Group, Inc. All Rights Reserved.

# RIDER SCHEDULE

Insured Person:                                            ROBERT W RUTLEDGE

Insurance Age:                                             51

Rider Date of Issue:                                       January 16, 2021

Maximum Death Benefit You Can Accelerate:                  $500,000.00 Not a benefit amount. Subject to an
                                                           actuarial discount.  See Rider for details.

Maximum Administrative Charge:                             $250.00

Covered Riders:                                            None

Election Period:                                           60 days from date of Your receipt of election form

**Rider Schedule Continued**

## MINIMUM ACCELERATED BENEFIT PERCENTAGE
(See the Minimum Accelerated Benefit Amount provision of this rider.)

| POLICY YEAR | PERCENTAGE | POLICY YEAR | PERCENTAGE |
|---|---|---|---|
| 1 | 70.00% | 36 | 70.00% |
| 2 | 70.00% | 37 | 70.00% |
| 3 | 70.00% | 38 | 70.00% |
| 4 | 70.00% | 39 | 70.00% |
| 5 | 70.00% | 40 | 70.00% |
| 6 | 70.00% | 41 | 70.00% |
| 7 | 70.00% | 42 | 70.00% |
| 8 | 70.00% | 43 | 70.00% |
| 9 | 70.00% | 44 | 70.00% |
| 10 | 70.00% | 45 | 70.00% |
| 11 | 70.00% | 46 | 70.00% |
| 12 | 70.00% | 47 | 70.00% |
| 13 | 70.00% | 48 | 70.00% |
| 14 | 70.00% | 49 | 70.00% |
| 15 | 70.00% | 50 | 70.00% |
| 16 | 70.00% | 51 | 70.00% |
| 17 | 70.00% | 52 | 70.00% |
| 18 | 70.00% | 53 | 70.00% |
| 19 | 70.00% | 54 | 70.00% |
| 20 | 70.00% | 55 | 70.00% |
| 21 | 70.00% | 56 | 70.00% |
| 22 | 70.00% | 57 | 70.00% |
| 23 | 70.00% | 58 | 70.00% |
| 24 | 70.00% | 59 | 70.00% |
| 25 | 70.00% | 60 | 70.00% |
| 26 | 70.00% | 61 | 70.00% |
| 27 | 70.00% | 62 | 70.00% |
| 28 | 70.00% | 63 | 70.00% |
| 29 | 70.00% | 64 | 70.00% |
| 30 | 70.00% | 65 | 70.00% |
| 31 | 70.00% | 66 | 70.00% |
| 32 | 70.00% | 67 | 70.00% |
| 33 | 70.00% | 68 | 70.00% |
| 34 | 70.00% | 69 | 70.00% |
| 35 | 70.00% | 70 | 70.00% |

# AMERICAN GENERAL LIFE INSURANCE COMPANY

## CHRONIC ILLNESS ACCELERATED DEATH BENEFIT RIDER
Provides for Election to Accelerate a Portion of the Policy Amount

This rider is issued as part of the Policy to which it is attached.

ANY BENEFIT PAID UNDER THIS RIDER WILL IMPACT THE POLICY. THE POLICY AMOUNT, CASH VALUE AND LOAN VALUE WILL BE REDUCED IF AN ACCELERATED DEATH BENEFIT IS PAID. THE IMPACT ON THE POLICY IS DISCUSSED IN THE IMPACT ON POLICY PROVISION OF THIS RIDER. YOU SHOULD CONTACT YOUR PERSONAL TAX ADVISOR FOR SPECIFIC ADVICE BEFORE EXERCISING ANY RIGHTS UNDER THIS RIDER. PAYMENTS RECEIVED UNDER THIS CHRONIC ILLNESS ACCELERATED DEATH BENEFIT RIDER ARE NOT PART OF A HEALTH, LONG TERM CARE, OR NURSING HOME INSURANCE POLICY AND MAY NOT BE SUFFICIENT TO COVER MEDICAL, NURSING HOME OR OTHER BILLS.

ALL PROVISIONS OF THE POLICY THAT DO NOT CONFLICT WITH THIS RIDER APPLY TO THIS RIDER. WHERE THERE IS ANY CONFLICT BETWEEN THE RIDER PROVISIONS AND THE POLICY PROVISIONS, THE RIDER PROVISIONS PREVAIL.

## DEFINITIONS

Capitalized terms not defined in this rider will have the meaning given in the Policy.

**Accelerated Benefit.** The term "Accelerated Benefit" means a Chronic Illness Accelerated Death Benefit Amount paid to the Owner during the Insured Person's lifetime. You may choose to receive the Accelerated Benefit in a lump sum or in periodic payments.

**Accelerated Benefit Payment Date.** The term "Accelerated Benefit Payment Date" means the date an Accelerated Benefit is paid. This date will be no later than 31 days following the satisfaction of all applicable provisions and requirements under this rider and the Policy with respect to a claim.

**Activities of Daily Living.** The term "Activities of Daily Living" means the following self-care functions:

1. Bathing: Washing oneself by sponge bath, or in either a tub or shower, including the task of getting into or out of the tub or shower.

2. Continence: The ability to maintain control of bowel and bladder functions; or, when unable to maintain control of bowel or bladder functions, the ability to perform the associated personal hygiene (including caring for catheter or colostomy bag).

3. Dressing: Putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

4. Eating: Feeding oneself by getting food into the body from a receptacle (such as a plate, cup or table), or by feeding tube, or intravenously.

5. Toileting: Getting to and from the toilet, getting on and off the toilet and performing associated personal hygiene.

6. Transferring: Moving into or out of a bed, chair, or wheelchair.

**Certified/Certification.** The term "Certified/Certification" means a written definitive determination of an Insured Person's Qualifying Chronic Illness signed by a Licensed Health Care Practitioner in support of a claim under this rider. The results of the Certification must be documented in and supported by the Insured Person's medical records and provided to Us.

**Covered Rider**. The term "Covered Rider" means any benefit rider identified on the Rider Schedule as eligible for acceleration under an accelerated benefit rider.

**Chronic Illness Accelerated Death Benefit Amount**. The term "Chronic Illness Accelerated Death Benefit Amount" means as to any Qualifying Chronic Illness:

1. The maximum dollar amount that We determine can be payable with respect to a claim under this rider to the Owner upon satisfaction of all applicable provisions and requirements under this rider and the Policy; or

2. Any lesser amount elected by the Owner to be received under this rider. The Chronic Illness Accelerated Death Benefit Amount for a Qualifying Chronic Illness will never be less than the applicable Minimum Accelerated Benefit Amount for such Qualifying Chronic Illness.

**Death Benefit You Elect to Accelerate.** The term "Death Benefit You Elect to Accelerate" means the portion of the Policy Amount that the Owner elects to accelerate on a given Accelerated Benefit Payment Date. It may not exceed the Maximum Death Benefit You Can Accelerate determined in accordance with the Maximum Death Benefit You Can Accelerate provision of this rider. It may not reduce the Policy Amount below the minimum amount under Our then-current rules.

**Elimination Period**. The term "Elimination Period" means a period of consecutive days as shown on the Rider Schedule, beginning at any time after an Insured Person's coverage under this rider has been in force for 30 consecutive days, during which the Insured Person must continuously have a Qualifying Chronic Illness prior to eligibility for benefits under this rider. No Accelerated Benefit is payable during the Elimination Period.

**Hands-on-Assistance.** The term "Hands-on-Assistance" means the physical assistance of another person without which the Insured Person would be unable to perform any Activities of Daily Living.

**Immediate Family Member.** The term "Immediate Family Member" means Your or the Insured Person's:

1. Spouse; or

2. Parents; or

3. Brothers and sisters; or

4. Children by blood, adoption or marriage; or

5. The spouse of any person listed in items 2, 3 or 4 above.

**Insured Person.** The term "Insured Person" means the person named as Insured in the Policy and/or person(s) insured under a Covered Rider.

**Licensed Health Care Practitioner.** The term "Licensed Health Care Practitioner" means any of the following who is not an Immediate Family Member:

1. A Physician; or

2. A registered professional nurse; or

3. A licensed social worker; or

4. Any other individual who meets such requirements as may be prescribed by the Secretary of the Treasury of the United States.

Licensed Health Care Practitioner does NOT mean:

1. You; or

2. The Insured Person; or

3. A person who lives with You or the Insured Person.

4. A person who is an Immediate Family Member.

**Physician.** The term "Physician" (as defined in section 1861(r)(1) of the Social Security Act) means a doctor of medicine or osteopathy legally authorized to practice medicine or surgery by the State in which he or she performs such function or action. Physician does NOT mean:

1. You; or

2. The Insured Person; or

3. A person who lives with You or the Insured Person; or

4. A person who is an Immediate Family Member.

**Policy.** The term "Policy" means the Policy to which this rider is attached.

**Policy Amount.** The term "Policy Amount" means the amount of insurance coverage for the Insured Person under the Policy and/or any other Covered Rider. Policy Amount does not include the amount of insurance under any other rider(s) attached to the Policy.

**Qualifying Chronic Illness.** The term "Qualifying Chronic Illness" means an illness or condition that:

1. A Licensed Health Care Practitioner has Certified within the past 12 months as affecting the Insured Person so that he or she:

   a. Is unable to perform, without Substantial Assistance from another person, at least two Activities of Daily Living for a period of at least 90 consecutive days due to a loss of functional capacity; or

    b.    Requires Substantial Supervision to protect such Insured Person from threats to health and safety due to Severe Cognitive Impairment; and

2. A Licensed Health Care Practitioner has Certified within the past 12 months as affecting the Insured Person so that he or she is under a plan of care prescribed by a Licensed Health Care Practitioner for necessary diagnostic, preventative, therapeutic, curing, treating, mitigating and rehabilitative services and for maintenance or personal care services required by a person with such illness or condition; and

3. A Licensed Health Care Practitioner has Certified after such Insured Person's coverage under this rider has been in force for 30 consecutive days.

No Chronic Illness Accelerated Death Benefit will be payable for an illness or condition caused by alcoholism, drug addiction, or a mental or nervous disorder (except for disorders comparable to Alzheimer's disease and similar forms of irreversible dementia), and alcoholism or drug addiction.

**Severe Cognitive Impairment.** The term "Severe Cognitive Impairment" means a loss or deterioration in intellectual capacity that is comparable to (and includes) Alzheimer's disease and similar forms of irreversible dementia and is measured by clinical evidence and standardized tests that reliably measure impairment in the person's:

1. Short-term or long-term memory; and

2. Orientation as to people, places or time; and

3. Deductive or abstract reasoning.

**Standby Assistance.** The term "Standby Assistance" means the presence of another person within arm's reach of the Insured Person that is necessary, by physical intervention, to prevent injury to the Insured Person while the Insured Person is performing the Activities of Daily Living.

**State.** The term "State" means one of the United States (U.S.) states, plus the District of Columbia, and including Guam, the U.S. Virgin Islands and Puerto Rico.

**Substantial Assistance.** The term "Substantial Assistance" means either Hands-on-Assistance or Standby Assistance.

**Substantial Supervision.** The term "Substantial Supervision" means continual supervision (which may include cueing by verbal prompting, gestures, or demonstrations) by another person that is necessary to protect the Insured Person from threats to the Insured Person's health or safety (including, but not limited to, such threats as may result from wandering).

## BENEFITS

**Benefit Eligibility Under This Rider.** Subject to the terms of this rider, You are eligible to elect to accelerate a portion of the Policy Amount if:

1. The Insured Person is Certified as having a Qualifying Chronic Illness while such Insured Person's coverage under this rider is in force; and

2. The Insured Person is Certified as having a Qualifying Chronic Illness within the past 12 months; and

3. You satisfy the requirements of the Filing An Accelerated Benefit Claim provision.

**Chronic Illness Accelerated Death Benefit Amount.**   We will determine the Chronic Illness Accelerated Death Benefit Amount as of the Accelerated Benefit Payment Date, after You file a claim for Accelerated Benefits for an Insured Person under this rider.

The Chronic Illness Accelerated Death Benefit Amount will be equal to the Death Benefit You Elect to Accelerate, less the following deductions:

1. The actuarial discount determined by Us; and

2. An administrative charge, not to exceed the Maximum Administrative Charge shown on the Rider Schedule; and

3. Payment of any unpaid but due Policy premiums up to the Accelerated Benefit Payment Date; and

4. If applicable, payment of a pro rata amount of any Policy loans.

As a result of these deductions, the Chronic Illness Accelerated Death Benefit Amount will in all cases be less than the Death Benefit You Elect to Accelerate, and may be substantially less but not less than the applicable Minimum Accelerated Benefit Amount.  Election of the Chronic Illness Accelerated Death Benefit Amount and payment of an Accelerated Benefit will, however, reduce the Policy Amount by the full amount of the Death Benefit You Elect to Accelerate as discussed in the Impact On Policy provision.

We will determine the actuarial discount applicable to the Death Benefit You Elect to Accelerate using factors including, but not limited to, the following:

1. The Accumulation Value and Cash Surrender Value, if any, under the Policy; and

2. The future premiums or charges payable under the Policy; and

3. Our assessment of the expected future mortality of the Insured Person; and

4. An interest rate that will not exceed the greater of the yield on 90-day U.S. Treasury Bills or the statutory adjustable Policy loan interest rate on the Accelerated Benefit Payment Date.

If the source of the interest rate used in determining the Death Benefit You Elect to Accelerate is discontinued, We will use an appropriate substitute and comparable interest rate, subject to the approval by the Interstate Insurance Product Regulation Commission (IIPRC).

Accelerated Benefits are paid to You, or Your estate, prior to the death of the Insured Person. The Accelerated Benefit payments may be used for any purpose.

**Minimum Accelerated Benefit Amount.**  The Minimum Accelerated Benefit Amount will be the greater of:

1.  The applicable Minimum Accelerated Benefit Percentage shown on the Rider Schedule multiplied by the Death Benefit You Elect to Accelerate, which is then reduced by the following deductions:

    a.  Payment of any unpaid but due Policy premiums up to the Accelerated Benefit Payment Date; and

    b.  If applicable, payment of a pro rata amount of any Policy loans; or

2.  The pro rata portion of the Cash Surrender Value, if any, which corresponds to the Death Benefit You Elect to Accelerate.

**It is possible that the Minimum Accelerated Benefit Amount as calculated above may be zero.**

**Maximum Death Benefit You Can Accelerate.** The Maximum Death Benefit You Can Accelerate as to an Insured Person under this rider is the lesser of:

1.  The then-current Policy Amount; or

2.  The Maximum Death Benefit You Can Accelerate shown on the Rider Schedule.

We reserve the right to limit the Maximum Death Benefit You Can Accelerate to ensure that the Policy Amount after an Accelerated Benefit is paid is not less than the minimum amount required to qualify as life insurance under applicable tax laws.

We will recalculate the Maximum Death Benefit You Can Accelerate each time a benefit is paid under any accelerated death benefit rider attached to the Policy. We will provide the new Maximum Death Benefit You Can Accelerate in an endorsement to the Policy.

**Benefit Payment Options.** You have the option to elect to receive the Chronic Illness Accelerated Death Benefit Amount in one lump-sum payment or in periodic payments.

If You elect to receive the Chronic Illness Accelerated Death Benefit Amount in periodic payments, You may request that the periodic payments be paid for a fixed period of time which cannot be longer than the Maximum Periodic Payment Period shown on the Rider Schedule. You may request that such periodic payments be paid monthly or according to another periodic payment frequency, if any, that We then make available for such periodic payments. We will divide the Chronic Illness Accelerated Death Benefit Amount You elect into equal periodic payments over the requested period. Each periodic payment must be at least equal to the minimum required under Our current rules at the time payments are made. The administrative charge under this rider will be subtracted from the first periodic payment.

If You elect to receive the Chronic Illness Accelerated Death Benefit Amount in periodic payments that extend beyond the 12-month period from the initial Certification in support of a claim, then, in order to continue to qualify to receive such periodic payments, a new Certification of the Insured Person's Qualifying Chronic Illness must be received by Us no later than:

1.  12 months from the end of the initial 12-month period following the date of the Certification submitted in support of a claim under the rider; and

2. Every 12 months thereafter for so long as periodic payments are payable.

There may be tax consequences for electing a Chronic Illness Accelerated Death Benefit Amount above the amount that would be tax qualified under the Internal Revenue Code.

**Impact of Changes in the Specified Amount.** If the Specified Amount of the Policy is increased under the terms of the Policy, the Maximum Death Benefit You Can Accelerate may be increased. We will require an application and evidence of insurability satisfactory to Us for any increase in the Maximum Death Benefit You Can Accelerate.

If the Specified Amount of the Policy is reduced, the Maximum Death Benefit You Can Accelerate may be reduced.

**Impact On Policy.** The following adjustments are made upon payment of the Accelerated Benefit for an Insured Person on a given Accelerated Benefit Payment Date:

1. The Insured Person's Policy Amount under the Policy and/or any Covered Riders will be reduced by the Death Benefit You Elect to Accelerate (not the Chronic Illness Accelerated Death Benefit Amount); and

2. The Maximum Death Benefit You Can Accelerate will be recalculated; and

3. If applicable, the Surrender Charges, Accumulation Value, Cash Surrender Value, cash value, any Policy loans and any Continuation Guarantee Account are reduced in the same proportion as the reduction in the Insured Person's Policy Amount; and

4. The future premiums and charges for the Insured Person's life insurance under the Policy and/or any Covered Riders are set as if such insurance had been originally issued at the reduced Policy Amount.

For periodic payments, the reduction to the Policy Amount will be divided equally among the periodic payments and will be made as to each at the time of such periodic payment. The Insured Person's life insurance under the Policy and/or any Covered Riders will terminate on the Accelerated Benefit Payment Date if the Policy Amount for such insurance is reduced to zero.

## CLAIMS

**Claims.** A written request for benefits must be submitted to Us. Upon receipt of the request, We will mail a claim form to You within 15 working days. If the claim form is not sent within this 15-day period, and You provide proof satisfactory to Us that the Insured Person has a Qualifying Chronic Illness in a format other than Our claim form, You will be deemed to have complied with the claim requirement. Required proof includes, but is not limited to, a Certification signed by a Licensed Health Care Practitioner certifying that the Insured Person has a Qualifying Chronic Illness, and complete records of the Insured Person's medical history, Diagnosis and treatments.

**Filing An Accelerated Benefit Claim.** To begin the claim process under this rider, You must provide the following items:

1. A completed claim form received by Us at Our claim office; and

2.  A then-current Certification of the Insured Person's Qualifying Chronic Illness by a Licensed Health Care Practitioner certifying that the Insured Person currently has, and for the duration of the Elimination Period had, a Qualifying Chronic Illness.  Such Certification must be received by Us at Our claim office; and

3.  The written consent, on a form provided by Us, of any irrevocable Beneficiary, assignee or other required party to Your election of an Accelerated Benefit under this rider.

The failure to provide a required claim form (with the requested attachments) within the period set forth in this rider may preclude payment of a benefit.

Regarding a Certification, We reserve the right to obtain a second medical opinion from a Licensed Health Care Practitioner and/or additional medical records of an Insured Person at Our expense. In the event of conflicting opinions, Certification of a Qualifying Chronic Illness shall be determined by a third medical opinion at Our expense from a Licensed Health Care Practitioner who is mutually acceptable to both You and Us.

If We determine that the conditions for payment of an Accelerated Benefit have been met, We will notify You of the Chronic Illness Accelerated Death Benefit Amount that You may elect, if any, for a Qualifying Chronic Illness and We will send You an election form.  You must complete the election form and return it to Us within the Election Period shown on the Rider Schedule.  The failure to provide the required election form (with the requested attachments) within the Election Period may preclude payment of a benefit and may require You to file a new claim as to the Qualifying Chronic Illness.  You may choose either to elect or not to elect a Chronic Illness Accelerated Death Benefit Amount that will be paid as an Accelerated Benefit for such Qualifying Chronic Illness.  Payment of any Chronic Illness Accelerated Death Benefit Amount as an Accelerated Benefit is due immediately upon Our receipt of Your election form in which You have elected a Chronic Illness Accelerated Death Benefit Amount.

## GENERAL PROVISIONS

**Limitations**.  You are not eligible to elect a Chronic Illness Accelerated Death Benefit Amount or receive an Accelerated Benefit under this rider if:

1.  You are required by law to use this rider to meet the claims of creditors, whether in bankruptcy or otherwise; or

2.  You are required by a government agency to use this rider to apply for, obtain or keep a government benefit or entitlement; or

3.  You are required by a court order to maintain such Insured Person's life insurance coverage under the Policy and/or any Covered Riders for another person's benefit; or

4.  Any Qualifying Chronic Illness results directly from the Insured Person's self-inflicted injury or attempted suicide, while sane or insane; or

5.  The consent of any irrevocable Beneficiary, assignee or other required party to Your election of an Accelerated Benefit has not been obtained; or

6. The Insured Person dies after You elect to receive a Chronic Illness Accelerated Death Benefit Amount and before We pay an Accelerated Benefit. Such election will be voided and the Policy's Death Benefit or Death Benefit Proceeds, as the case may be, will be payable. For purposes of this provision, such payment shall be deemed to have occurred if We have placed a check containing the Accelerated Benefit in the U.S. mail, placed a check containing the Accelerated Benefit in the hands of a recognized overnight delivery service for delivery or established a retained asset account at the Owner's direction.

**Effects Of Accelerated Benefit Payments.** You should consider that receiving or being eligible to receive an Accelerated Benefit may affect Your eligibility for Medicaid, Supplemental Security Income (SSI), or other government benefits or entitlements. **Contact the Medicaid Unit of Your local Department of Public Welfare and the Social Security Administration for more information. If You begin a claim during the contestability period of the Policy or of a reinstatement of the Policy, the entire Policy may be rescinded if there is any material misrepresentation of information provided in the application for the Policy or in any applicable reinstatement application.**

**Report To Owner.** Upon the election of a Chronic Illness Accelerated Death Benefit Amount and payment of any Accelerated Benefit, We will provide You, and any irrevocable beneficiary, with a statement which outlines the effect of the Accelerated Benefit payment on the Policy as described in the Impact On Policy provision.

**Not Contestable After Two Years.** We will not contest an Insured Person's coverage under this rider after such coverage has been in force during such Insured Person's lifetime for two (2) years from the Rider Date of Issue or the date of last reinstatement of such Insured Person's coverage under this rider, whichever occurs last, except We may contest such Insured Person's coverage under this rider for any claim for a Qualifying Chronic Illness that was Certified before the end of such two-year period.

**Suicide Exclusion.** If You exercise Your right to elect a Chronic Illness Accelerated Death Benefit Amount and the Policy does not terminate and the Insured Person subsequently commits suicide, while sane or insane, within two (2) years from the Rider Date of Issue or the date We approve Your reinstatement application, the Death Benefit under the Policy will be that described in the Suicide Exclusion provision of the Policy less any Accelerated Benefit payments and accrued interest, and may be zero.

**Reinstatement.** If the Policy and this rider are terminated, and the Policy is reinstated, then this rider will also be reinstated, subject to submission of evidence of insurability satisfactory to Us.

**Termination**. If more than one person has coverage under this rider, coverage for each Insured Person under this rider will terminate on the earliest of:

1. The date on which You elect to accelerate the entire Maximum Death Benefit You Can Accelerate in force for such Insured Person under the Policy and/or any Covered Riders; or

2. The date on which such Insured Person's life insurance coverage under the Policy and/or any Covered Riders terminates; or

3. Any date requested by You in writing; or

4.   The date this rider terminates.

This rider will terminate on the earliest of:

1.   The date on which You elect to accelerate the entire Maximum Death Benefit You Can Accelerate in force for all Insured Persons covered under this rider; or

2.   The date the Policy terminates; or

3.   Any date requested by You in writing.

Termination of this rider will not preclude the payment of benefits if the covered loss is sustained and all of the conditions in the Benefit Eligibility Under This Rider provision are met while this rider is in force.

**Policy Provisions Applicable.**   This rider is subject to all the conditions and provisions of the Policy to which it is attached, except as provided herein.  In the event of a conflict, the provisions of this rider will prevail.

The effective date of this rider is the Rider Date of Issue.

President

© American International Group, Inc. All Rights Reserved.

# RIDER SCHEDULE

| | |
|---|---|
| Insured Person: | ROBERT W RUTLEDGE |
| Insurance Age: | 51 |
| Rider Date of Issue: | January 16, 2021 |
| Maximum Death Benefit You Can Accelerate: | $500,000.00 Not a benefit amount. Subject to an actuarial discount.  See Rider for details. |
| Maximum Administrative Charge: | $250.00 |
| Elimination Period: | 90 days |
| Covered Riders: | None |
| Election Period: | 60 days from date of Your receipt of election form |
| Maximum Periodic Payment Period: | 12 months |

## Rider Schedule Continued

## MINIMUM ACCELERATED BENEFIT PERCENTAGE
(See the Minimum Accelerated Benefit Amount provision of this rider.)

| POLICY YEAR | PERCENTAGE | POLICY YEAR | PERCENTAGE |
|---|---|---|---|
| 1 | 2.00% | 36 | 54.00% |
| 2 | 2.00% | 37 | 58.00% |
| 3 | 3.00% | 38 | 61.00% |
| 4 | 4.00% | 39 | 64.00% |
| 5 | 4.00% | 40 | 66.00% |
| 6 | 5.00% | 41 | 69.00% |
| 7 | 6.00% | 42 | 70.00% |
| 8 | 6.00% | 43 | 70.00% |
| 9 | 7.00% | 44 | 70.00% |
| 10 | 8.00% | 45 | 70.00% |
| 11 | 9.00% | 46 | 70.00% |
| 12 | 10.00% | 47 | 70.00% |
| 13 | 12.00% | 48 | 70.00% |
| 14 | 13.00% | 49 | 70.00% |
| 15 | 14.00% | 50 | 70.00% |
| 16 | 15.00% | 51 | 70.00% |
| 17 | 17.00% | 52 | 70.00% |
| 18 | 18.00% | 53 | 70.00% |
| 19 | 20.00% | 54 | 70.00% |
| 20 | 21.00% | 55 | 70.00% |
| 21 | 23.00% | 56 | 70.00% |
| 22 | 25.00% | 57 | 70.00% |
| 23 | 27.00% | 58 | 70.00% |
| 24 | 28.00% | 59 | 70.00% |
| 25 | 30.00% | 60 | 70.00% |
| 26 | 32.00% | 61 | 70.00% |
| 27 | 34.00% | 62 | 70.00% |
| 28 | 36.00% | 63 | 70.00% |
| 29 | 38.00% | 64 | 70.00% |
| 30 | 40.00% | 65 | 70.00% |
| 31 | 41.00% | 66 | 70.00% |
| 32 | 44.00% | 67 | 70.00% |
| 33 | 46.00% | 68 | 70.00% |
| 34 | 48.00% | 69 | 70.00% |
| 35 | 51.00% | 70 | 70.00% |

## AMERICAN GENERAL LIFE INSURANCE COMPANY

### CRITICAL ILLNESS ACCELERATED DEATH BENEFIT RIDER
Provides for Election to Accelerate a Portion of the Policy Amount

This rider is issued as part of the Policy to which it is attached.

ANY BENEFIT PAID UNDER THIS RIDER WILL IMPACT THE POLICY. THE POLICY AMOUNT, CASH VALUE AND LOAN VALUE WILL BE REDUCED IF AN ACCELERATED DEATH BENEFIT IS PAID. THE IMPACT ON THE POLICY IS DISCUSSED IN THE IMPACT ON POLICY PROVISION OF THIS RIDER. YOU SHOULD CONTACT YOUR PERSONAL TAX ADVISOR FOR SPECIFIC ADVICE BEFORE EXERCISING ANY RIGHTS UNDER THIS RIDER. PAYMENTS RECEIVED UNDER THIS CRITICAL ILLNESS ACCELERATED DEATH BENEFIT RIDER ARE NOT PART OF A HEALTH, LONG TERM CARE, OR NURSING HOME INSURANCE POLICY AND MAY NOT BE SUFFICIENT TO COVER MEDICAL, NURSING HOME OR OTHER BILLS.

ALL PROVISIONS OF THE POLICY THAT DO NOT CONFLICT WITH THIS RIDER APPLY TO THIS RIDER. WHERE THERE IS ANY CONFLICT BETWEEN THE RIDER PROVISIONS AND THE POLICY PROVISIONS, THE RIDER PROVISIONS PREVAIL.


## DEFINITIONS

Capitalized terms not defined in this rider will have the meaning given in the Policy.

**Accelerated Benefit.** The term "Accelerated Benefit" means the Critical Illness Accelerated Death Benefit Amount paid to the Owner during the Insured Person's lifetime, with respect to any single occurrence of a Qualifying Critical Illness.

**Accelerated Benefit Payment Date.** The term "Accelerated Benefit Payment Date" means the date an Accelerated Benefit is paid with respect to any single occurrence of a Qualifying Critical Illness. This date will be no later than 31 days following the satisfaction of all applicable provisions and requirements under this rider and the Policy with respect to a claim.

**Certified/Certification.** The term "Certified/Certification" means a written definitive determination of an Insured Person's Qualifying Critical Illness signed by a Physician in support of a claim under this rider. The results of the Certification must be documented in and supported by the Insured Person's medical records and provided to Us.

**Coma.** The term "Coma" means a profound state of unconsciousness which lasts for a period of at least 96 hours from which the Insured Person cannot be aroused to consciousness and in which stimulation will produce no more than primitive avoidance reflexes. It must arise from a neurological deficit that is expected to last for a continuous 12-month period or longer from the date of the Diagnosis.

**Covered Rider**. The term "Covered Rider" means any benefit rider identified on the Rider Schedule as eligible for acceleration under an accelerated benefit rider.

**Critical Illness Accelerated Death Benefit Amount.** The term "Critical Illness Accelerated Death Benefit Amount" means as to any Qualifying Critical Illness:

1. The maximum dollar amount that We determine can be payable with respect to a claim under this rider to the Owner upon satisfaction of all applicable provisions and requirements under this rider and the Policy; or

2. Any lesser amount elected by the Owner to be received under this rider. The Critical Illness Accelerated Death Benefit Amount for a Qualifying Critical Illness will never be less than the applicable Minimum Accelerated Benefit Amount for such Qualifying Critical Illness.

**Coronary Artery Bypass.** The term "Coronary Artery Bypass" means the use of a non-coronary blood vessel or blood vessels (either artery or vein) to surgically bypass obstructions in a native coronary artery or arteries.

An illness that does not require surgery but requires a medical procedure such as balloon angioplasty (with or without stent(s)), thrombolytic therapy, laser relief of an obstruction, and/or other intra-arterial procedures is NOT covered.

**Diagnosed/Diagnosis.** The term "Diagnosed/Diagnosis" means a written definitive Diagnosis of an Insured Person's Qualifying Critical Illness signed by a Physician. It must:

1. Be based upon the use of diagnostic evaluations, clinical and/or laboratory investigations, tests and observations that follow recommended and accepted medical practices, the results of which must be documented in and supported by the Insured Person's medical records and provided to Us; and

2. Meet any diagnostic requirements for the Qualifying Critical Illness being Diagnosed as stated in the Diagnostic Requirements provision of this rider.

**Death Benefit You Elect to Accelerate.** The term "Death Benefit You Elect to Accelerate" means the portion of the Policy Amount that the Owner elects to accelerate on a given Accelerated Benefit Payment Date. It may not exceed the Maximum Death Benefit You Can Accelerate determined in accordance with the Maximum Death Benefit You Can Accelerate provision of this rider. It may not reduce the Policy Amount below the minimum amount under Our then-current rules.

**End Stage Renal Failure.** The term "End Stage Renal Failure" means the irreversible and total failure of both kidneys, which requires the undergoing of regular renal dialysis.

**Hemiplegia.** The term "Hemiplegia" means the complete and irreversible Paralysis of the upper and lower Limbs on the same side of the body.

**Immediate Family Member.** The term "Immediate Family Member" means Your or the Insured Person's:

1. Spouse; or

2. Parents; or

3.   Brothers and sisters; or

4.   Children by blood, adoption or marriage; or

5.   The spouse of any person listed in items 2, 3 or 4 above.

**Insured Person.**   The term "Insured Person" means the person named as Insured in the Policy and/or person(s) insured under a Covered Rider.

**In Situ Cancer.**   The term "In Situ Cancer" means the non-invasive cancer that is confined to the site of origin and does not invade below the most superficial level or is described as "In Situ" in a pathology report.

**Invasive Cancer.**   The term "Invasive Cancer" means the presence of one or more malignant tumors characterized by the uncontrolled growth and spread of malignant cells and the invasion of normal tissue. The term "Invasive Cancer" also means the following forms of blood cancer: lymphoma, leukemia, multiple myeloma and myelodysplastic syndromes.   Invasive Cancer does NOT include the following:

1.   Leukoplakia; or

2.   Hyperplasia; or

3.   Carcinoid; or

4.   Polycythemia; or

5.   Stage 1 Hodgkin's disease; or

6.   Stage A prostate cancer (less than a $T1cN_0M_0$); or

7.   Duke's stage A colon cancer ($T_2N_0M_0$ or less); or

8.   Intraductal non-invasive breast cancer; or

9.   Stage 0 or 1 transitional cell carcinoma of urinary bladder ($T_1N_0M_0$ or less); or

10.   In Situ Cancer; or

11.   Any skin cancer other than malignant melanoma with a depth of 1mm or deeper or greater than Clark level 2; or

12.   $T_1N_0M_0$ (TNM Classification System) papillary carcinoma of the thyroid less than 1 cm in diameter; or

13.   Any other pre-malignant lesions, benign tumors or polyps.

**Limb.**   The term "Limb" means entire arm or entire leg.

**Major Heart Attack.**   The term "Major Heart Attack" means the death of a portion of the heart muscle resulting from inadequate blood supply to the relevant area. Major Heart Attack does NOT include angina or the chance finding of electrocardiographic (EKG) changes indicative of a previous heart attack.

**Major Organ Transplant.**  The term "Major Organ Transplant" means the receipt by transplant of any of the following organs or tissues: heart, lung, liver, or pancreas.

**Paralysis.**  The term "Paralysis" means Quadriplegia, Paraplegia or Hemiplegia that is expected to last for a continuous 12-month period or longer from the date of the Diagnosis.

**Paraplegia.**  The term "Paraplegia" means the complete and irreversible Paralysis of both lower Limbs.

**Physician.**  The term "Physician" (as defined in section 1861(r)(1) of the Social Security Act) means a doctor of medicine or osteopathy legally authorized to practice medicine or surgery by the State in which he or she performs such function or action.  Physician does NOT mean:

1.  You; or

2.  The Insured Person; or

3.  A person who lives with You or the Insured Person; or

4.  A person who is an Immediate Family Member.

**Policy.**  The term "Policy" means the Policy to which this rider is attached.

**Policy Amount.**  The term "Policy Amount" means the amount of insurance coverage for the Insured Person under the Policy and/or any other Covered Rider.  Policy Amount does not include the amount of insurance under any other rider(s) attached to the Policy.

**Qualifying Critical Illness.**  The term "Qualifying Critical Illness" means the occurrence of any of the following illnesses or conditions as to an Insured Person - Major Heart Attack, Stroke, Coronary Artery Bypass, Invasive Cancer, End Stage Renal Failure, Major Organ Transplant, Paralysis, Coma and Severe Burn:

1.  Which a Physician has Diagnosed within 365 days of the date of Our receipt of Certification at Our claim office pursuant to a claim under this rider; and

2.  Which a Physician has Diagnosed after such Insured Person's coverage under this rider has been in force for 30 consecutive days, or 90 consecutive days for Invasive Cancer; and

3.  Which is not an occurrence of the same illness or condition for which an Accelerated Benefit was previously paid under this rider as to the Insured Person.

**Quadriplegia.**  The term "Quadriplegia" means the complete and irreversible Paralysis of both upper and lower Limbs.

**Severe Burn.**  The term "Severe Burn" means the cosmetic disfigurement of body surface or area at one time comprised of one or more full-thickness or third-degree burns together covering at least 20% of the body surface.

**State.**  The term "State" means one of the United States (U.S.) states, plus the District of Columbia, and including Guam, the U.S. Virgin Islands and Puerto Rico.

**Stroke.**  The term "Stroke" means a cerebrovascular incident caused by infarction of brain tissue, cerebral hemorrhage, thrombosis or embolization from an extra-cranial source lasting more than 24 hours and producing measurable neurological deficit that persists for at least 30 consecutive days following the occurrence of the Stroke.  Stroke does NOT include Transient Ischemic Attacks (TIAs), Vertebro-basilar insufficiency or incidental findings on imaging studies.

**Transient Ischemic Attack (TIA).**  The term "Transient Ischemic Attack (TIA)" means a neurological condition or event with the signs and symptoms of Stroke, but which passes within a short time with no residual signs, symptoms, deficits or abnormalities that are revealed or shown on neuroimaging studies.

## DIAGNOSTIC REQUIREMENTS

**Coma.**  The Diagnosis of Coma must be documented by evidence of a neurological deficit that is expected to last for a continuous 12-month period or longer from the date of the Diagnosis determining Coma.

**Coronary Artery Bypass.**  The Diagnosis of the need for a Coronary Artery Bypass must be made by a Physician certified to practice cardiology based on angiographic evidence of the underlying disease.

**End Stage Renal Failure.**  The Diagnosis of End Stage Renal Failure must be made by a Physician and be based on the irreversible failure of the function of both kidneys, requiring regular dialysis.

**Invasive Cancer.**  Invasive Cancer must be Diagnosed by a Physician certified to practice pathological anatomy or osteopathic pathology and must be based on a microscopic examination of fixed tissues or preparations from the hemic system. Such Diagnosis shall be based solely on the accepted criteria of malignancy after a study of the histocytologic architecture or pattern of the suspected tumor, tissue and/or specimen.  Clinical Diagnosis of Invasive Cancer will be accepted as evidence that Invasive Cancer exists when a pathological Diagnosis cannot be made, provided the medical evidence substantially documents the clinical Diagnosis of Invasive Cancer and the Insured Person receives treatment for Invasive Cancer.

**Major Heart Attack.**  The Diagnosis of Major Heart Attack must be made by a Physician and be based on the presence of chest pain and at least two of the following criteria:

1.  New electrocardiographic (EKG) changes which support the Diagnosis; or

2.  Diagnostic elevation of cardiac enzymes or biomedical markers; or

3.  Confirmatory imaging studies such as cardiac catherization, thallium scans, MUGA scans or stress echocardiograms.

**Major Organ Transplant.**  The Diagnosis of Major Organ Transplant must be made by a Physician and must include documentation of the illness or injury that resulted in the need to undergo a Major Organ Transplant.

**Paralysis.**  The Diagnosis of Paralysis must be made by a Physician and must be supported by the medical records of the Insured Person.

**Stroke.** The Diagnosis of Stroke must be made by a neurologist based on documented neurological deficits and confirmatory neuroimaging studies.

# BENEFITS

**Benefit Eligibility Under This Rider.** Subject to the terms of this rider, You are eligible to elect to accelerate a portion of the Policy Amount if:

1. The Insured Person is Diagnosed with and is Certified as having a Qualifying Critical Illness while such Insured Person's coverage under this rider is in force; and

2. You satisfy the requirements of the Filing An Accelerated Benefit Claim provision.

**Critical Illness Accelerated Death Benefit Amount.** We will determine the Critical Illness Accelerated Death Benefit Amount as of the Accelerated Benefit Payment Date, after You file a claim for Accelerated Benefits for an Insured Person under this rider.

The Critical Illness Accelerated Death Benefit Amount will be equal to the Death Benefit You Elect to Accelerate, less the following deductions:

1. The actuarial discount determined by Us; and

2. An administrative charge, not to exceed the Maximum Administrative Charge shown on the Rider Schedule; and

3. Payment of any unpaid but due Policy premiums up to the Accelerated Benefit Payment Date; and

4. If applicable, payment of a pro rata amount of any Policy loans.

As a result of these deductions, the Critical Illness Accelerated Death Benefit Amount will in all cases be less than the Death Benefit You Elect to Accelerate, and may be substantially less but not less than the applicable Minimum Accelerated Benefit Amount. Election of the Critical Illness Accelerated Death Benefit Amount and payment of an Accelerated Benefit will, however, reduce the Policy Amount by the full amount of the Death Benefit You Elect to Accelerate as discussed in the Impact On Policy provision.

We will determine the actuarial discount applicable to the Death Benefit You Elect to Accelerate using factors including, but not limited to, the following:

1. The Accumulation Value and Cash Surrender Value, if any, under the Policy; and

2. The future premiums or charges payable under the Policy; and

3. Our assessment of the expected future mortality of the Insured Person; and

4. An interest rate that will not exceed the greater of the yield on 90-day U.S. Treasury Bills or the statutory adjustable Policy loan interest rate on the Accelerated Benefit Payment Date.

If the source of the interest rate used in determining the Death Benefit You Elect to Accelerate is discontinued, We will use an appropriate substitute and comparable interest rate, subject to the approval by the Interstate Insurance Product Regulation Commission (IIPRC).

We will pay each Critical Illness Accelerated Death Benefit Amount in a lump sum.

Accelerated Benefits are paid to You, or Your estate, prior to the death of the Insured Person. The Accelerated Benefit payments may be used for any purpose.

**Minimum Accelerated Benefit Amount.** The Minimum Accelerated Benefit Amount will be the greater of:

1. The applicable Minimum Accelerated Benefit Percentage for the applicable Qualifying Critical Illness shown on the Rider Schedule multiplied by the Death Benefit You Elect to Accelerate, which is then reduced by the following deductions:

   a. Payment of any unpaid but due Policy premiums up to the Accelerated Benefit Payment Date; and

   b. If applicable, payment of a pro rata amount of any Policy loans; or

2. The pro rata portion of the Cash Surrender Value, if any, which corresponds to the Death Benefit You Elect to Accelerate.

**It is possible that the Minimum Accelerated Benefit Amount as calculated above may be zero.**

**Maximum Death Benefit You Can Accelerate.** The Maximum Death Benefit You Can Accelerate as to an Insured Person under this rider is the lesser of:

1. The then-current Policy Amount; or

2. The Maximum Death Benefit You Can Accelerate shown on the Rider Schedule.

We reserve the right to limit the Maximum Death Benefit You Can Accelerate to ensure that the Policy Amount after an Accelerated Benefit is paid is not less than the minimum amount required to qualify as life insurance under applicable tax laws.

We will recalculate the Maximum Death Benefit You Can Accelerate each time a benefit is paid under any accelerated death benefit rider attached to the Policy. We will provide the new Maximum Death Benefit You Can Accelerate in an endorsement to the Policy.

**Impact of Changes in the Specified Amount.** If the Specified Amount of the Policy is increased under the terms of the Policy, the Maximum Death Benefit You Can Accelerate may be increased. We will require an application and evidence of insurability satisfactory to Us for any increase in the Maximum Death Benefit You Can Accelerate.

If the Specified Amount of the Policy is reduced, the Maximum Death Benefit You Can Accelerate may be reduced.

**Impact On Policy.** The following adjustments are made upon payment of the Accelerated Benefit for an Insured Person on a given Accelerated Benefit Payment Date:

1. The Insured Person's Policy Amount under the Policy and/or any Covered Riders will be reduced by the Death Benefit You Elect to Accelerate (not the Critical Illness Accelerated Death Benefit Amount); and

2. The Maximum Death Benefit You Can Accelerate will be recalculated; and

3. If applicable, the Surrender Charges, Accumulation Value, Cash Surrender Value, cash value, any Policy loans and any Continuation Guarantee Account are reduced in the same proportion as the reduction in the Insured Person's Policy Amount; and

4. The future premiums and charges for the Insured Person's life insurance under the Policy and/or any Covered Riders are set as if such insurance had been originally issued at the reduced Policy Amount.

The Insured Person's life insurance under the Policy and/or any Covered Riders will terminate on the Accelerated Benefit Payment Date if the Policy Amount for such insurance is reduced to zero.

# CLAIMS

**Claims.** A written request for benefits must be submitted to Us. Upon receipt of the request, We will mail a claim form to You within 15 working days. If the claim form is not sent within this 15-day period, and You provide proof satisfactory to Us that the Insured Person has a Qualifying Critical Illness in a format other than Our claim form, You will be deemed to have complied with the claim requirement. Required proof includes, but is not limited to, a Certification signed by a Physician certifying that the Insured Person has been Diagnosed with a Qualifying Critical Illness, and complete records of the Insured Person's medical history, Diagnosis and treatments.

**Filing An Accelerated Benefit Claim.** To begin the claim process under this rider, You must provide the following items:

1. A completed claim form and then-current Certification of a Qualifying Critical Illness by a Physician received by Us at Our claim office; and

2. The written consent, on a form provided by Us, of any irrevocable Beneficiary, assignee or other required party to Your election of an Accelerated Benefit under this rider.

The failure to provide a required claim form (with the requested attachments) within the period set forth in this rider may preclude payment of a benefit.

Regarding a Diagnosis, We reserve the right to obtain a second medical opinion from a Physician and/or additional medical records of an Insured Person at Our expense. In the event of conflicting opinions, Diagnosis of a Qualifying Critical Illness shall be determined by a third medical opinion, at Our expense, from a Physician who is mutually acceptable to both You and Us.

If We determine that the conditions for payment of an Accelerated Benefit have been met, We will notify You of the Critical Illness Accelerated Death Benefit Amount that You may elect, if any, for a Qualifying Critical Illness and We will send You an election form. You must complete the election form and return it to Us within the Election Period shown on the Rider Schedule. The failure to provide the required election form (with the requested attachments) within the Election Period may preclude payment of a benefit. You may choose either to elect or not to elect a Critical Illness Accelerated Death Benefit Amount that will be paid as an Accelerated Benefit for such Qualifying Critical Illness. Payment of any Critical Illness Accelerated Death Benefit Amount as an Accelerated Benefit is due immediately upon Our receipt of Your election form in which You have elected a Critical Illness Accelerated Death Benefit Amount. **If, as to the occurrence of a Qualifying Critical Illness, You decide not to elect a Critical Illness Accelerated Death Benefit Amount or if You decide to elect to receive less than the maximum Accelerated Benefit available for such Qualifying Critical Illness, You cannot thereafter elect a Critical Illness Accelerated Death Benefit Amount and receive an Accelerated Benefit for the same occurrence of such Qualifying Critical Illness.**

# GENERAL PROVISIONS

**Limitations.** You are not eligible to elect a Critical Illness Accelerated Death Benefit Amount or receive an Accelerated Benefit under this rider if:

1. You are required by law to use this rider to meet the claims of creditors, whether in bankruptcy or otherwise; or

2. You are required by a government agency to use this rider to apply for, obtain or keep a government benefit or entitlement; or

3. You are required by a court order to maintain such Insured Person's life insurance coverage under this Policy and/or any Covered Riders for another person's benefit; or

4. Any Qualifying Critical Illness results directly from the Insured Person's self-inflicted injury or attempted suicide, while sane or insane; or

5. The consent of any irrevocable Beneficiary, assignee or other required party to Your election of an Accelerated Benefit has not been obtained; or

6. The Insured Person dies after You elect to receive a Critical Illness Accelerated Death Benefit Amount and before We pay an Accelerated Benefit. Such election will be voided and the Policy's Death Benefit or Death Benefit Proceeds, as the case may be, will be payable. For purposes of this provision, such payment shall be deemed to have occurred if We have placed a check containing the Accelerated Benefit in the U.S. mail, placed a check containing the Accelerated Benefit in the hands of a recognized overnight delivery service for delivery or established a retained asset account at the Owner's direction.

**Effects Of Accelerated Benefit Payments.** You should consider that receiving or being eligible to receive an Accelerated Benefit may affect Your eligibility for Medicaid, Supplemental Security Income (SSI), or other government benefits or entitlements. **Contact the Medicaid Unit of Your local Department of Public Welfare and the Social Security Administration for more information. If You begin a claim during the contestability period of the Policy or of a reinstatement of the Policy, the entire Policy may be rescinded if there is any material misrepresentation of information provided in the application for the Policy or in any applicable reinstatement application.**

**Report To Owner.** Upon the election of a Critical Illness Accelerated Death Benefit Amount and payment of any Accelerated Benefit, We will provide You, and any irrevocable beneficiary, with a statement which outlines the effect of the Accelerated Benefit payment on the Policy as described in the Impact On Policy provision.

**Not Contestable After Two Years.** We will not contest an Insured Person's coverage under this rider after such coverage has been in force during such Insured Person's lifetime for two (2) years from the Rider Date of Issue or the date of last reinstatement of such Insured Person's coverage under this rider, whichever occurs last, except We may contest such Insured Person's coverage under this rider for any claim for a Qualifying Critical Illness that was Diagnosed or Certified before the end of such two-year period.

**Suicide Exclusion.** If You exercise Your right to elect a Critical Illness Accelerated Death Benefit Amount and the Policy does not terminate and the Insured Person subsequently commits suicide, while sane or insane, within two (2) years from the Rider Date of Issue or the date We approve Your reinstatement application, the Death Benefit under the Policy will be that described in the Suicide Exclusion provision of the Policy less any Accelerated Benefit payments and accrued interest, and may be zero.

**Reinstatement.** If the Policy and this rider are terminated, and the Policy is reinstated, then this rider will also be reinstated, subject to submission of evidence of insurability satisfactory to Us.

**Termination**. If more than one person has coverage under this rider, coverage for each Insured Person under this rider will terminate on the earliest of:

1.  The date on which You elect to accelerate the entire Maximum Death Benefit You Can Accelerate in force for such Insured Person under the Policy and/or any Covered Riders; or

2.  The date on which such Insured Person's life insurance coverage under the Policy and/or any Covered Riders terminates; or

3.  Any date requested by You in writing; or

4.  The date this rider terminates.

This rider will terminate on the earliest of:

1.  The date on which You elect to accelerate the entire Maximum Death Benefit You Can Accelerate in force for all Insured Persons covered under this rider; or

2. The date the Policy terminates; or

3. Any date requested by You in writing.

Termination of this rider will not preclude the payment of benefits if the covered loss is sustained and all of the conditions in the Benefit Eligibility Under This Rider provision are met while this rider is in force.

**Policy Provisions Applicable.** This rider is subject to all the conditions and provisions of the Policy to which it is attached, except as provided herein. In the event of a conflict, the provisions of this rider will prevail.

The effective date of this rider is the Rider Date of Issue.

President

© American International Group, Inc. All Rights Reserved.

# RIDER SCHEDULE

| | |
|---|---|
| Insured Person: | ROBERT W RUTLEDGE |
| Insurance Age: | 51 |
| Rider Date of Issue: | January 16, 2021 |
| Maximum Death Benefit You Can Accelerate: | $500,000.00 Not a benefit amount. Subject to an actuarial discount.  See Rider for details. |
| Maximum Administrative Charge: | $250.00 |
| Covered Riders: | None |
| Election Period: | 60 days from date of Your receipt of election form |

**Rider Schedule Continued**

## MINIMUM ACCELERATED BENEFIT PERCENTAGE
(See the Minimum Accelerated Benefit Amount provision of this rider.)

| POLICY YEAR | INVASIVE CANCER | QUALIFYING CRITICAL ILLNESS OTHER THAN INVASIVE CANCER | POLICY YEAR | INVASIVE CANCER | QUALIFYING CRITICAL ILLNESS OTHER THAN INVASIVE CANCER |
|---|---|---|---|---|---|
| 1 | 4.00% | 2.00% | 36 | 55.00% | 54.00% |
| 2 | 5.00% | 2.00% | 37 | 58.00% | 58.00% |
| 3 | 5.00% | 3.00% | 38 | 62.00% | 61.00% |
| 4 | 6.00% | 4.00% | 39 | 65.00% | 64.00% |
| 5 | 6.00% | 4.00% | 40 | 67.00% | 66.00% |
| 6 | 7.00% | 5.00% | 41 | 69.00% | 69.00% |
| 7 | 8.00% | 6.00% | 42 | 70.00% | 70.00% |
| 8 | 9.00% | 6.00% | 43 | 70.00% | 70.00% |
| 9 | 10.00% | 7.00% | 44 | 70.00% | 70.00% |
| 10 | 11.00% | 8.00% | 45 | 70.00% | 70.00% |
| 11 | 12.00% | 9.00% | 46 | 70.00% | 70.00% |
| 12 | 13.00% | 10.00% | 47 | 70.00% | 70.00% |
| 13 | 14.00% | 12.00% | 48 | 70.00% | 70.00% |
| 14 | 15.00% | 13.00% | 49 | 70.00% | 70.00% |
| 15 | 16.00% | 14.00% | 50 | 70.00% | 70.00% |
| 16 | 18.00% | 15.00% | 51 | 70.00% | 70.00% |
| 17 | 19.00% | 17.00% | 52 | 70.00% | 70.00% |
| 18 | 20.00% | 18.00% | 53 | 70.00% | 70.00% |
| 19 | 22.00% | 20.00% | 54 | 70.00% | 70.00% |
| 20 | 23.00% | 21.00% | 55 | 70.00% | 70.00% |
| 21 | 25.00% | 23.00% | 56 | 70.00% | 70.00% |
| 22 | 27.00% | 25.00% | 57 | 70.00% | 70.00% |
| 23 | 28.00% | 27.00% | 58 | 70.00% | 70.00% |
| 24 | 30.00% | 28.00% | 59 | 70.00% | 70.00% |
| 25 | 32.00% | 30.00% | 60 | 70.00% | 70.00% |
| 26 | 34.00% | 32.00% | 61 | 70.00% | 70.00% |
| 27 | 35.00% | 34.00% | 62 | 70.00% | 70.00% |
| 28 | 37.00% | 36.00% | 63 | 70.00% | 70.00% |
| 29 | 39.00% | 38.00% | 64 | 70.00% | 70.00% |
| 30 | 41.00% | 40.00% | 65 | 70.00% | 70.00% |
| 31 | 43.00% | 41.00% | 66 | 70.00% | 70.00% |
| 32 | 45.00% | 44.00% | 67 | 70.00% | 70.00% |
| 33 | 47.00% | 46.00% | 68 | 70.00% | 70.00% |
| 34 | 50.00% | 48.00% | 69 | 70.00% | 70.00% |
| 35 | 52.00% | 51.00% | 70 | 70.00% | 70.00% |



Policy Acceptance and
Amendment of Application

☑ **American General Life Insurance Company, 2727-A Allen Parkway, Houston, Texas 77019**
☐ **The United States Life Insurance Company in the City of New York, 175 Water Street, New York, NY 10038**
*A member of American International Group, Inc. (AIG)*

In this amendment, the "Company" refers to the insurance company whose name is checked above.

The insurance company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other company is responsible for such obligations or payments.

## Proposed Insured

Primary Proposed Insured: First Name   ROBERT                    MI   W    Last Name    RUTLEDGE

Other Proposed Insured: First Name                         MI          Last Name

Policy Number:    4209668408

I hereby acknowledge receipt and acceptance of the policy described below. I also accept all matters set forth in the policy which was issued that differ from the policy for which application was made. I understand and agree that the original application is deemed to be altered as follows:

- Application amended with Primary Insured's Name as ROBERT RUTLEDGE
- Application amended with the Primary Beneficiary as follows: PRATIWI RUTLEDGE,Spouse,100%

I represent, on behalf of myself and any person who may have been proposed for insurance, that to the best of my knowledge and belief:
1. There have been no changes to my occupation nor have I become unemployed since the date of the application; or
2. Neither I nor any other proposed insured has, since the date of the application:
   a. Consulted a licensed health care provider or received medical or surgical advice or treatment; or
   b. Acquired any knowledge or belief that any representation in the application, including information provided or an answer to a question, is now inaccurate, incomplete, or untrue.

Exceptions:

**In the event any exception is noted herein, the policy will not be in force until the Company approves this Policy Acceptance and Amendment of Application.**

**Agreement:** I hereby represent that I have read (or have had read to me) and understand the statements made above. I agree that this Policy Acceptance and Amendment of Application will be made a part of the policy.

**Owner Signature**

X

**Owner signed on** (date) _____
**Show title of officer if signing for the business.**

**Proposed Insured (PPI) Signature** (if other than Owner)

X

*(If under age 16, signature of parent or guardian)*
**PPI signed on** (date) _____

**Other Proposed Insured (OPI) Signature** (if other than Owner)

X

*(If under age 16 and coverage exceeds $500,000, signature of both parents required.)*
**OPI signed on** (date) _____

ICC15-108095



☑ American General Life Insurance Company, 2727-A Allen Parkway, Houston, Texas 77019
☐ The United States Life Insurance Company in the City of New York, 175 Water Street, New York, NY 10038
*A member of American International Group, Inc. (AIG)*

In this amendment, the "Company" refers to the insurance company whose name is checked above.

The insurance company shown above is solely responsible for the obligation and payment of benefits under any policy that it may issue. No other company is responsible for such obligations or payments.

### Proposed Insured

| | | | | |
|---|---|---|---|---|
| Primary Proposed Insured: First Name | ROBERT | MI W | Last Name | RUTLEDGE |
| Other Proposed Insured: First Name | | MI | Last Name | |

Policy Number: 4209668408

I hereby acknowledge receipt and acceptance of the policy described below. I also accept all matters set forth in the policy which was issued that differ from the policy for which application was made. I understand and agree that the original application is deemed to be altered as follows:

- Application amended with Primary Insured's Name as ROBERT RUTLEDGE
- Application amended with the Primary Beneficiary as follows: PRATIWI RUTLEDGE, Spouse - 100%

I represent, on behalf of myself and any person who may have been proposed for insurance, that to the best of my knowledge and belief:
- There have been no changes to my occupation nor have I become unemployed since the date of the application; or
- Neither I nor any other proposed insured has, since the date of the application:
  - Consulted a licensed health care provider or received medical or surgical advice or treatment; or
  - Acquired any knowledge or belief that any representation in the application, including information provided or an answer to a question, is now inaccurate, incomplete, or untrue.

Exceptions: _____

In the event any exception is noted herein, the policy will not be in force until the Company approves this Policy Acceptance and Amendment of Application.

Agreement: I hereby represent that I have read (or have had read to me) and understand the statements made below. I agree that this Policy Acceptance and Amendment of Application will be made a part of the policy.

Owner Signature

X _____

Owner signed on (date) _____
Show title of officer if signing for the business.

Proposed Insured (PPI) Signature (if other than Owner)

X _____
*(If under age 16, signature of parent or guardian)*
PPI signed on (date) _____

Other Proposed Insured (OPI) Signature (if other than Owner)

X _____
*(If under age 16 and coverage exceeds $500,000, signature of both parents required.)*
OPI signed on (date) _____

ICC15-108095



☒ **American General Life Insurance Company,** 2727-A Allen Parkway, Houston, TX 77019
☐ **The United States Life Insurance Company in the City of New York,** 175 Water St, New York, NY 10038
*A member of American International Group, Inc. (AIG)*

The insurance company checked above ("Company") is responsible for the obligation and payment of benefits under any policy that it may issue. No other company is responsible for such obligations or payments.

---

**1. Primary Proposed Insured**

First Name Bob _____ MI W Last Name Rutledge _____ Gender ☒M ☐F

SSN ▮▮▮▮▮▮ Birthplace* *(US State, or country)* MN, USA _____ DOB ▮▮▮▮ Current Age 51

**Tobacco Use** Has the Primary Proposed Insured ever used any form of tobacco or nicotine products? ☐yes ☒no

*Type* and *Quantity* Used _____ If yes, a current user? ☐yes ☐no If no, date of last use _____

Driver's License ☒yes ☐no License State MN _____ Number E415081788110 _____

If over age of 16 and no license, please explain. _____

Address 19886 Harvest Dr _____ City Lakeville _____ State MN ZIP 55044

Primary Phone 612 590-0961 _____ Alternate Phone _____ Email tiwipriyadi@yahoo.com

Employer Faegre Baker Daniels _____ Occupation Computer Operator _____ Date of Employment (mm/dd/yy) 04/02/2005

Job Duties _____ Average No. of hours worked per week 38

Actively at work? ☒yes ☐no Able to perform all job duties? ☒yes ☐no If either is no, explain _____

Personal Earned Income (Annual): $ 69,000.00 _____ Household Income (Annual): $ 69,000.00 ____ Net Worth $ UNKNOWN

Personal Earned Income means monies received for work performed.

If Primary Proposed Insured is not self-supporting or is a child under age 18, what amount of insurance is in force and/or pending on:

Owner $ _____ Spouse $ _____ Father $ _____ Mother $ _____ Siblings $ _____ Premium Payor $ _____

**Citizenship** U.S. Citizen or Permanent Resident Card holder ☒yes ☐no If no, answer the following:

Country of Citizenship _____ Date of Entry _____ Visa Type _____ (Copy of Visa Required)

Own property or have a mortgage in the U.S.? ☐yes ☐no Plan to remain in the U.S.? ☐yes ☐no

---

**2. Owner - Complete if Primary Proposed Insured is not the Owner -** *(If Owner is a business, charitable entity or trust, answer question 5 below.)*

First Name _____ MI ___ Last Name _____ Gender ☐M ☐F

SSN _____ DOB _____ Relationship to Proposed Insured _____

Driver's License ☐yes ☐no License State _____ Number _____

U.S. Citizen ☐yes ☐no If no, Country of Citizenship _____ Date of Entry _____

Visa Type _____ Exp. Date _____

Address _____ City _____ State _____ ZIP _____

Primary Phone _____ Email _____

*(If contingent Owner is required, use question 12.)*

---

**3. Reason for Insurance -** *(If Business, complete Financial Questionnaire)* Family Protection

---

**4. Beneficiary -** *(If Beneficiary is a business, charitable entity or trust, answer question 5 below.)*

| No. | Name | DOB mm/dd/yy | SSN | Phone Number | Relationship | Share % | Beneficiary Type |
|---|---|---|---|---|---|---|---|
| 1 | Tiwi Rutledge | ▮▮▮▮ | | | Wife | 100 | ☒Primary |
| | Address: | | Email: | | | | ☐Contingent |
| 2 | Jaslyn Rutledge | ▮▮▮▮ | | | Daughter | 100 | ☐Primary |
| | Address: | | Email: | | | | ☒Contingent |
| 3 | | | | | | | ☐Primary |
| | Address: | | Email: | | | | ☐Contingent |

---

*for identification purposes only*



**5. Entity Information** - *Complete if Owner or Beneficiary is a business, charitable entity or trust. If applicable, complete the Certification of Trust.*
(Check the applicable boxes information applies to: ☐ Owner and/or ☐ Beneficiary. If also the Premium Payor, complete section 9E.)

Exact Name _____ Tax ID # _____

Address _____ City _____ State _____ ZIP _____

Current Trustee Name _____ Date of Trust _____

Corporate Officer Name _____ Title _____

Email Address of applicable Trustee or Corporate Signer _____

Relationship to Proposed Insured _____ Type of Entity (SCorp, CCorp , DBA, etc.) _____

**6. Product** - *Signed Illustration/Quotation is required for all UL & VUL products.*
Plan Name (Complete appropriate supplemental application if applicable. For Index UL, complete the Index UL Supplemental Application.)
  American General Quality of Life Flex Term 30

Term Duration** 30 _____ Premium Class Quoted Preferred Nontobacco _____

Amount Applied For: Base Coverage $ 500,000 _____ Supplemental Coverage** $ _____

Death Benefit Compliance Test Used**: ☐ Guideline Premium ☐ Cash Value Accumulation I Automatic Premium Loan**: ☐ yes ☐ no

**7. Death Benefit Options** - *(For UL & VUL only)* ☐ Level ☐ Increasing

**8. Riders/Benefits** - *Refer to Rider Reference Page for riders and benefits available per product.*

☐ Accidental Death Benefit $ _____          ☐ Waiver of Monthly          ☐ Other #4 _____
☐ Child Rider[1] $ _____                Guarantee Premium           Amount/Unit(s) _____
  ☐ No current children                        ☐ Waiver of Premium          1 - Complete Child Rider Supplement
☐ Chronic Illness Rider (AAS)[2]              ☐ Other #1 _____     2 - Complete Chronic Illness Supplement
☐ Lifestyle Income[3]                            Amount/Unit(s) _____   3 - Chronic Illness Rider (AAS) required with
  Withdrawal Benefit Basis _ %                ☐ Other #2 _____        Lifestyle Income when AAS is approved.
☐ Terminal Illness                               Amount/Unit(s) _____      This requirement varies by product.
☐ Waiver of Monthly Deduction                 ☐ Other #3 _____        Complete Chronic Illness Supplement,
                                                  Amount/Unit(s) _____      if applicable.

**9. Premium Payment** ☒ Modal $ 1,576.50 _____ ☐ Single $ _____ ☐ Additional/Lump Sum $ _____

  **A. Frequency of modal premium:** ☐ Annual ☐ Semi-annual ☐ Quarterly ☒ Monthly *(Bank Draft only)*

  **B. Method:** ☐ Direct Billing ☒ Bank Draft *(Complete Bank Draft Authorization)* ☐ List Bill: Number _____
    ☐ Credit Card - Initial Premium Only *(Complete Credit Card Authorization)* ☐ Other *(Please explain)* _____

  **C. Amount submitted with application** $ _____

  **D. Special Dating** *(not available for VUL products):* Save Age ......................................................... ☐ yes ☐ no

  **E. Premium Payor** *(Complete if Payor is other than Owner or if Owner is Trustee.)*
    First Name _____ MI ___ Last Name _____ Gender ☐ M ☐ F
    SSN or Tax ID # _____ Relationship to Primary Proposed Insured _____
    Driver's License ☐ yes ☐ no License State _____ Number _____ DOB _____
    U.S. Citizen ☐ yes ☐ no If no, Country of Citizenship _____ Date of Entry _____
    Visa Type _____ Exp. Date _____
    Address _____ City _____ State _____ ZIP _____
    *If Payor is different from the Insured or the Owner and Bank Draft or Credit Card is not the chosen form of payment, also*
    *complete the Payor Authorization Form.*

**10. Existing Coverage and Replacements**

"Replace" means that the life insurance policy being applied for may replace, change or use monetary value from an existing or pending life insurance policy or annuity contract. If the transaction is a replacement, also complete the replacement-related form for the state where the application is signed.

  **A. Does the Primary Proposed Insured have any existing annuity, life insurance, or disability insurance**
  **or have any application pending for such coverage with this Company or any other company?**................................. ☒ yes ☐ no



**B. If question 10A is answered "yes", please provide the following information:**

| No. | Policy Number | Year of Issue | Coverage (see below) | Benefit Period (if DI) | Type (see below) | Coverage Being Replaced? | 1035 Exchange? |
|---|---|---|---|---|---|---|---|
| 1 | unknown | 2009 | LI | | I | ☐Y ☒N | ☐Y ☐N |
| | Company Name: AMERICAN FAMILY LIFE INS. CO. | | | | Amount of Coverage $ 500,000.00 | | |
| 2 | unknown | 2010 | LI | | I | ☐Y ☒N | ☐Y ☐N |
| | Company Name: AMERICAN FAMILY LIFE INS. CO. | | | | Amount of Coverage $ 500,000.00 | | |
| 3 | | | | | | ☐Y ☐N | ☐Y ☐N |
| | Company Name: | | | | Amount of Coverage $ | | |

**Coverage:** LI=Life, H=Health, A=Annuity, LT=LTC, DI= Disability Income  **Type:** i=individual, b=business, g=group, p=pending

**11. Background Information -** *Provide details specified for all "Yes" answers or complete applicable questionnaires.*

**A.** Does the Primary Proposed Insured intend to travel or reside outside of the United States or Canada within the next two years? *(If yes, list country(ies), city(ies), date, length of stay(s), and purpose or complete the Foreign Travel and Residence Questionnaire)* ................................................................☐ yes ☒ no

**B.** In the past five years, has the Primary Proposed Insured flown as a pilot, student pilot or crew member of any aircraft, or have any intention to do so in the next two years? *(If yes, complete the Aviation Questionnaire)* ..☐ yes ☒ no

**C.** In the past five years, has the Primary Proposed Insured engaged in motor sports events or racing (auto, truck, motorcycle, boat, etc.); rock or mountain climbing; skin or scuba diving; aeronautics (hang-gliding, sky diving, parachuting, ultra light, soaring, ballooning,) or have any intention to do so in the next two years? *(If yes, complete the Avocation Questionnaire)* ....☐ yes ☒ no

**D.** Has the Primary Proposed Insured ever had an application for insurance modified, rated, declined, postponed or withdrawn? *(If yes, list type of coverage, date and reason)* ....................................☐ yes ☒ no

**E.** Has the Primary Proposed Insured ever filed for bankruptcy, or have the intention to seek bankruptcy protection within the next 12 months? *(If filed, list chapter filed, date, reason, and discharge date)* ............☐ yes ☒ no

**F.** In the past five years, has the Primary Proposed Insured pled guilty or been convicted of any driving violations to include driving under the influence of alcohol or drugs? *(If yes, list date, state, license #, and specific violation)* ...☐ yes ☒ no

**G.** Has the Primary Proposed Insured ever been convicted of, or is currently charged with, a felony or misdemeanor? *(If yes, list date, county, state, charge, current status and if currently incarcerated or on parole or probation.)* ......☐ yes ☒ no

**H.** Is the Primary Proposed Insured an active duty service member of the U.S. Armed Forces? *(If yes, provide Pay Grade, Rank and any known foreign assignments, and complete any required Military Sales Disclosure)* .....☐ yes ☒ no

**I.** Is there an intention that any party, other than the listed Owner or Beneficiary, will obtain any right, title, or interest in any policy issued on the life of the Primary Proposed Insured as a result of this application? .........☐ yes ☒ no

**J.** Does the Owner or Primary Proposed Insured intend to finance any of the premium required to pay for this policy through a financing or loan agreement? ...........................................................☐ yes ☒ no

**K.** Is the Owner, Primary Proposed Insured, or any person or entity, being paid (cash, services, or any other form of payment) as an incentive to enter into this transaction? *(If yes, describe the incentive)* .................☐ yes ☒ no

**12. The space below may also be used to elaborate on answers to any questions on this application.**

## Agreement, Authorization to Obtain and Disclose Information and Signatures

I, the Primary Proposed Insured (and any Owner signing below) acknowledge that I have read the statements contained in this application and any attachments or they have been read to me. My answers to the questions in this application are true and complete to the best of my knowledge and belief. I understand that this application: (1) consists of Part A, Part B, and if applicable, related attachments including certain questionnaire(s), supplement(s) and addendum(s); and (2) is the basis for any policy and any rider(s) issued. I understand that no information about me will be considered to have been given to the Company by me unless it is stated in the application. I agree to notify the Company of any changes in the statements or answers given in the application between the time of application and delivery of any policy. I understand that any misrepresentation contained in this application and relied on by the Company may be used to reduce or deny a claim or void the policy if: (1) such misrepresentation materially affects the acceptance of the risk; and (2) the policy is within its contestable period.

Except as may be provided in any Limited Temporary Life Insurance Agreement ("LTLIA"), I understand and agree that, even if I paid a premium, no insurance will be in effect under this application or under any new policy or any rider(s) that may be issued by the Company unless or until all three of the following conditions are met: (1) the policy has been delivered and accepted; (2) the full first modal premium for the issued policy has been paid; and (3) there has been no change in the health of any Proposed Insured(s) that would change the answer to any question in the application before items (1) and (2) in this paragraph have occurred. I understand and agree that, if all three conditions above are not met: (1) no insurance will be in effect; and (2) the Company's liability will be limited to a refund of any premiums paid, regardless of whether loss occurs before premiums are refunded.

If I have received and accepted the LTLIA, I understand and agree that such insurance is available only on the life of the Primary Proposed Insured under the life policy (and the Other Proposed Insured under a joint and survivorship life policy, if applicable) and only if the conditions set forth in the LTLIA are met. I understand and agree that such temporary insurance is not available as to any riders or any accident and/or health insurance.

I understand and agree that no agent is authorized to accept risks or pass upon insurability, make or modify contracts, or waive any of the Company's rights or requirements.

I have received a copy of or have been read the Notices to the Proposed Insured(s).

I authorize any medical professional; any hospital, clinic or other health care facility; any pharmacy benefit manager or prescription database; any insurance or reinsurance company; any consumer reporting agency or insurance support organization; my employer; the Medical Information Bureau (MIB); or any other person or organization that has any records or knowledge of me or my physical or mental health or insurability, or that of any minor child for whom application for insurance is being made, to disclose and give to the Company, its legal representatives, its affiliated service companies, and its affiliated insurers all information they have pertaining to: medical consultations; treatments; surgeries; hospital confinements for physical and/or mental conditions; use of drugs or alcohol; drug prescriptions; or any other information concerning me, or any minor child for whom application for insurance is being made. Other information may include, but is not limited to, items such as: personal finances including credit as permitted; habits; hazardous avocations; motor vehicle records from the Department of Motor Vehicles; court records; or foreign travel, etc.

I understand that the information obtained will be used by the Company to determine: (1) eligibility for insurance; (2) eligibility for benefits under an existing policy; and (3) verification of answers and statements on this application. I further authorize the Company to conduct a media or electronic search on me. Any information gathered during the evaluation of my application may be disclosed to: other insurers to whom I may apply for coverage; reinsurers; the MIB; other persons or organizations performing business or legal services in connection with my application or claim; me; any physician designated by me; or any person or entity required to receive such information by law or as I may further consent.

I, as well as any person authorized to act on my behalf, may, upon written request, obtain a copy of this consent. I understand this consent may be revoked at any time by sending a written request to the Company, Attn: Underwriting Department at P.O. Box 1931, Houston, TX 77251-1931. This consent will be valid for 24 months from the date of this application. I agree that a copy of this consent will be as valid as the original. I authorize the Company, its affiliated insurers, and its affiliated service companies to obtain an investigative consumer report on me. I understand that I may: (1) request to be interviewed for the report; and (2) upon written request, receive a copy of such report.

☐ Check if you wish to be interviewed.

---

**IRS Certification:** Under penalties of perjury, I certify that: 1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and 2. I am not subject to backup withholding because: (a) I am exempt from backup withholding (enter exempt payee code*, if applicable: _____), OR (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and 3. I am a U.S. citizen or other U.S. person*, and 4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct (enter exemption from FATCA reporting code, if applicable: _____). **Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For contributions to an individual retirement arrangement (IRA) and, generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. *See General Instructions provided on the IRS Form W-9 available from IRS.gov. ** If you can complete a Form W-9 and you are a U.S. citizen or U.S. resident alien, FATCA reporting may not apply to you. Please consult your own tax advisors.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

**Owner Signature**

X _____

**Owner Title** _____
*(If Corporate Officer or Trustee)*

**Owner signed at** (city, state) LAKEVILLE          MN

**Owner signed on** (date) 1/4/2021

**Primary Proposed Insured Signature** (if other than Owner)

eSigned by Bob W Rutledge on 1/4/2021 at 2:50 PM CST
X _____
*(If under age 16, signature of parent or guardian)*

**Agent(s) Signature(s)**
I certify that the information supplied has been truthfully and accurately recorded on the Part A application.

Writing Agent Name *(please print)* Kevin J Wilshusen

Writing Agent # 525614

Writing Agent Signature  X   *K. Smith*

**Other Parent or Guardian Signature**

X _____

*(If under age 16 and coverage exceeds $150,000, signature of both parents required)*



☒ **American General Life Insurance Company,** 2727-A Allen Parkway, Houston, TX 77019
☐ **The United States Life Insurance Company in the City of New York,** 175 Water St, New York, NY 10038
*A member of American International Group, Inc. (AIG)*

In this form, the "Company" refers to the insurance company whose name is checked above. The Company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other Company is responsible for such obligations or payments.

## Proposed Insured

*(Complete separate Part B for each Proposed Insured.)*

| BOB | W | RUTLEDGE | ████████ | ████████ |
|---|---|---|---|---|
| First Name | MI | Last Name | Date of Birth | Social Security # |

### Medical History

*(Instructions: Please answer ALL medical history questions. Do not leave any questions blank.)*

**1. Physician Information**

Name, address and phone number of the Proposed Insured's personal physician(s). *(If no personal physician, provide name, address and phone number of last doctor consulted or medical facility visited or to which admitted.)*

Name LORI CREAGAN                                    Phone _____

Address _____ City, State BURNSVILLE          MN ZIP _____

Date of last office visit, reason, findings and treatment: DATE: 2020, REASON: PHYSICAL, FINDINGS: NORMAL, TREATMENT: NA

FACILITY INFORMATION PRINTED ON THE SUPPLEMENT

**2. Pending Medical Appointments**

Does the Proposed Insured have a medical appointment scheduled within the next three months? ................................ ☐ yes ☒ no
*(If yes, provide date, name, address and phone number of physician, and reason for visit.)* _____

**3. Build**

**A.** Admitted Height and Weight _____ 5 ____ ft _____ 06 ____ in _____ 184 ____ lbs
*(Examiners: Also record measured height and weight on Exam page 1.)*

**B.** Birth Weight (if Proposed Insured is less than 1 year old) _____ lbs _____ oz

**C.** Has the Proposed Insured had any weight change in excess of 10 lbs in the past year? .................................... ☒ yes ☐ no
If yes, complete the following: Loss ___ 14 ___ lbs Gain _____ lbs Reason* LOSS: DIET/EXERCISE

*If weight change was due to pregnancy, provide due/delivery date and pre-pregnancy weight:
Due/Delivery Date _____ Pre-Pregnancy Weight _____ lbs

**4. Family History**

**A.** Complete the information in the grid below.

| Age if Living | Age at Death | Cause of Death | History of heart disease treated or diagnosed by a member of the medical profession (Coronary Artery Disease or Heart Attack)? | History of cancer treated or diagnosed by a member of the medical profession? |
|---|---|---|---|---|
| Father 73 | | | ☒ no ☐ yes Age of Onset _____<br>Details _____ | ☒ no ☐ yes Age of Onset _____<br>Type _____ |
| Mother | 61 | CANCER | ☒ no ☐ yes Age of Onset _____<br>Details _____ | ☐ no ☒ yes Age of Onset 51<br>Type LYPHOMA |
| Siblings 50 | | | ☒ no ☐ yes Age of Onset _____<br>Details _____ | ☒ no ☐ yes Age of Onset _____<br>Type _____ |

**B.** Other than as stated in 4A, has any immediate family member of the Proposed Insured (parents, siblings or children), been diagnosed with heart disease prior to age 50, Amyotrophic Lateral Sclerosis (ALS), polycystic kidney disease, porphyria, cardiomyopathy, sickle cell anemia, Huntington's disease, aneurysm, or cancer?............................................ ☐ yes ☒ no

*(Please provide details including type, age of onset, and relationship(s) to Proposed Insured.)*

Details: _____

**C.** Is there a family history (parents and siblings only) of mental illness, suicide, or substance abuse, any of which was diagnosed or treated by a member of the medical profession?........................................................................ ☐ yes ☒ no

*(Please provide details including diagnosis and relationship(s) to Proposed Insured.)*

Details: _____

## 5. Personal Health History

**A.** Has the Proposed Insured **ever** been diagnosed as having, been treated for, or consulted a member of the medical profession for:

1) high cholesterol?................................................................................................................................ ☐ yes ☒ no

Date of diagnosis _____ most recent level _____ treatment _____

2) high blood pressure?......................................................................................................................... ☐ yes ☒ no

Date of diagnosis _____ most recent reading _____ treatment _____

3) diabetes?............................................................................................................................................ ☐ yes ☒ no

Date of diagnosis _____ most recent HgbA1c _____ treatment _____

**B.** Has the Proposed Insured **ever** been diagnosed as having, been treated for, or consulted a member of the medical profession for:

1) coronary artery disease, heart attack, chest pain, shortness of breath, irregular heartbeat, heart murmur, or other disorder or disease of the heart?........................................................................................ ☐ yes ☒ no

2) blood clot, clotting disorder, aneurysm, stroke, transient ischemic attack (TIA), peripheral vascular disease, or other disease, disorder or blockage of the arteries or veins?.................................................. ☐ yes ☒ no

3) cancer, leukemia, lymphoma, tumors or growths, masses, cysts or other similar abnormalities?............. ☐ yes ☒ no

4) pituitary, thyroid, adrenal, or disease or disorder of any other glands? .................................................. ☐ yes ☒ no

5) anemia, hemophilia, sickle cell anemia, or other disease or disorder of the blood, lymphatic system or immune system?................................................................................................................................ ☐ yes ☒ no

6) colitis, Crohn's disease, hepatitis, colon polyps, or any disorder of the throat, esophagus, gall bladder, stomach, liver, pancreas or intestine? ............................................................................... ☐ yes ☒ no

7) disorder of the kidneys, bladder, prostate or reproductive organs or protein or blood in the urine? ......... ☐ yes ☒ no

8) asthma, chronic bronchitis, emphysema, chronic obstructive pulmonary disease (COPD), cystic fibrosis, sleep apnea or other breathing or lung disorder? ...................................................................................... ☒ yes ☐ no

9) seizures, cerebral palsy, Down syndrome, autism spectrum disorder, Parkinson's disease, multiple sclerosis, severe headaches, disorder or injury of the brain, spinal cord or nervous system? ................................... ☐ yes ☒ no

10) attention deficit hyperactivity disorder (ADHD), memory loss, dementia or Alzheimer's disease?........... ☐ yes ☒ no

11) anxiety, eating disorder, depression, suicide attempt, bipolar disease, post-traumatic stress disorder (PTSD), hallucinations, psychosis, schizophrenia, or other psychiatric conditions?...................................... ☐ yes ☒ no

12) arthritis, muscle disorders, Amyotrophic Lateral Sclerosis (ALS), fibromyalgia, muscular dystrophy, chronic pain, connective tissue disease, autoimmune disease or other bone or joint disorders? .......................... ☐ yes ☒ no

13) glaucoma, macular degeneration, optic neuritis or any disorder of the eyes, ears or skin?...................... ☐ yes ☒ no

*(For any yes answers, provide details such as: date of diagnosis, date of last treatment; name, address, and phone number of doctor; tests performed; test results; medications, hospitalization, ER visit, recommended treatment or any other pertinent details.)*

Details 8.A. ASTHMA, DIAGNOSIS DATE: 1988, NUMBER OF ATTACKS IN THE LAST YEAR: 0, WHAT

PRECIPITATES SYMPTOMS OR ATTACK?: 0, TREATMENT DATE: 2020, DOCTOR: LORI CREAGAN,

BURNSVILLE, MN, FACILITY: FAIRVIEW, USA, TESTS PERFORMED: NO, MEDICATIONS: ALBUTERAL,

DOSAGES: 108 MCG, FREQUENCY: PRN, ADVAIR DISK, DOSAGES: 250MCG, FREQUENCY: PRN,

HOSPITALIZATION REQUIRED: NO, ER VISIT REQUIRED: NO, TREATMENT: NA.

**C. Other than previously stated,** has the Proposed Insured taken any medications, had treatment or therapy or been under medical observation within the **past 12 months**? ............................................................ ☐ yes ☒ no

*(If yes, provide details such as: date of diagnosis; name, address, and phone number of doctor; tests performed; test results; medications or recommended treatment.)*

Details _____

_____

_____

**D.** Within the **past 5 years**, has the Proposed Insured used alcoholic beverages? ............................................. ☐ yes ☒ no

If yes, Average number of drinks per week_____ Maximum number of drinks per day _____

Type (Beer, Wine, Liquor) _____ Date of last use _____

**E.** Has the Proposed Insured **ever**:

1) used cocaine, heroin, methamphetamine, hallucinogens, stimulants or any other habit-forming drug except as prescribed by a medical professional? ....................................................................................... ☐ yes ☒ no

2) used marijuana (prescribed or otherwise) in any form? ............................................................................ ☐ yes ☒ no

3) used a controlled substance or prescription drug in a manner other than prescribed by a physician? ................. ☐ yes ☒ no

4) sought or received medical advice, counseling or treatment by a medical professional to discontinue or reduce the use of alcohol or drugs, including prescribed controlled substances? ...................................... ☐ yes ☒ no

If answered "Yes" to E1 through E4, please provide details below.

Type of drug(s) and/or alcohol _____ Date last used _____

Frequency of use:   ☐ Daily   ☐ Weekly   ☐ Monthly   Amount typically used:_____

Name(s) of doctor/facility _____ Phone _____

Address _____ City, State _____ ZIP _____

Treatment Dates _____

Support group(s) _____

Was treatment or support group attendance court ordered? ..................................................................... ☐ yes   ☐ no

Details of any drug or alcohol related arrests _____

**F.** Has the Proposed Insured **ever** tested positive for the Human Immunodeficiency Virus (HIV) or been diagnosed or treated by a member of the medical profession for Acquired Immune Deficiency Syndrome (AIDS)? ...................... ☐ yes ☒ no

*(If yes, provide details such as: date of diagnosis; name, address, and phone number of doctor.)*

Details _____

_____

_____

**G.** Other than previously stated, in the **past 5 years**, has the Proposed Insured:

1) been hospitalized, consulted a member of the medical profession or had any illness, injury or surgery? .............. ☐ yes ☒ no

2) been advised by a member of the medical profession concerning any abnormal diagnostic test results, been advised to see a specialist, or been advised to have any diagnostic test, hospitalization, surgery, or treatment that was NOT completed (except for those tests related to the Human Immunodeficiency Virus), or does the proposed insured have any test results pending? ............................................................ ☐ yes ☒ no

3) undergone any self-administered laboratory test prescribed by a member of the medical profession other than those for pregnancy or Human Immunodeficiency Virus (HIV)? ........................................................ ☐ yes ☒ no

4) made a claim for or received benefits, compensation, payment or pension for any injury, sickness, disability, or impaired condition? ........................................................................................................... ☐ yes ☒ no

*(For any yes answers, provide details such as: date of diagnosis; name, address, and phone number of doctor; tests performed; test results; medications, hospitalization, ER visit, recommended treatment or any other pertinent details.)*

Details _____

_____

_____

_____

_____

_____

_____

**H.** Has the Proposed Insured had any emergency room, emergency clinic, walk-in clinic, or free clinic visits during the **past 5 years?** ............................................................................................................................................ ☐ yes ☒ no

*(If yes, provide details such as: reason for visit; date; name, address, and phone number of facility; resolution of condition; or any other pertinent details.)*

Details_____

_____

_____

**I.** Has the Proposed Insured **ever** been advised to or chosen to enter a nursing home, hospice, or assisted living facility? ....................................................................................................................................... ☐ yes ☒ no

*(If yes, provide details such as: reason for visit; date; name, address, and phone number of facility; resolution of condition; or any other pertinent details.)*

Details_____

_____

_____

**J.** Within the **last 2 years** has the Proposed Insured:

1) been diagnosed or treated by a member of the medical profession for fainting, stumbling or falling while walking, problems with balance, deterioration in vision or hearing, or shortness of breath? ..................................... ☐ yes ☒ no

2) received home health care services, physical therapy or rehabilitation therapy? ...................................... ☐ yes ☒ no

3) required the use of a cane, walker, wheelchair, other assistive device, or resided in an assisted living facility? .... ☐ yes ☒ no

4) required assistance or supervision with or had any limitations in performing any of the following daily activities: bathing, bladder and/or bowel control, eating, dressing, toileting or transferring (moving into or out of a bed, chair or wheelchair)? ....................................................................................................... ☐ yes ☒ no

5) required assistance with routine activities such as: using the phone, taking medications, paying bills, shopping, driving a car, traveling outside of the home or preparing meals? ............................................... ☐ yes ☒ no

*(For any yes answers, provide details such as: date of diagnosis; name, address, and phone number of doctor; tests performed; test results; medications, hospitalization, ER visit, recommended treatment or any other pertinent details.)*

Details_____

_____

_____

**K.** Within the **last 5 years** has the Proposed Insured been treated for or been diagnosed by a member of the medical profession for any other medical, physical, or psychological condition **NOT** disclosed above? ..................... ☐ yes ☒ no

*(If yes, list condition and details such as: date of first occurrence; symptoms; and how treated.)*

Details_____

_____

_____

## Agreement and Signatures

I, the Proposed Insured signing below, acknowledge that I have read the statements contained in this application and any attachments or they have been read to me. My answers to the questions in this application are true and complete to the best of my knowledge and belief. I understand that this application: (1) consists of Part A, Part B, and if applicable, related attachments including certain questionnaire(s), supplement(s) and addendum(s); and (2) is the basis for any policy and any rider(s) issued. I understand that no information about me will be considered to have been given to the Company by me unless it is stated in the application. I agree to notify the Company of any changes in the statements or answers given in the application between the time of application and delivery of any policy. I understand that any misrepresentation contained in this application and relied on by the Company may be used to reduce or deny a claim or void the policy if: (1) such misrepresentation materially affects the acceptance of the risk; and (2) the policy is within its contestable period.

**Fraud**

Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

---

**SIGNATURE OF PROPOSED INSURED**

Signed at *(city, state)*    LAKEVILLE, MN    On *(date)*    1/4/2021

X _____
*(If under age 16, signature of parent or guardian)*

---

**SIGNATURE(S) OF INTERVIEWER(S) – TO BE SIGNED BY ALL INTERVIEWERS, AS APPLICABLE**

I certify that the information supplied by the Proposed Insured has been truthfully and accurately recorded on the Part B application.

**If Agent recorded information**

_____    Writing Agent #    Date
Writing Agent Name *(Please print)*

X _____
   Writing Agent Signature

**If Tele-interviewer recorded information**

_____    Company    Date
Name *(Please print)*

**If Paramedical Examiner/Medical Doctor recorded information**

Examiner Address   3030 HARBOR LN 130, PLYMOUTH, MN 55447    **Paramed: Use company stamp below.**

Examiner Phone #   763   746-3737

Examiner Name   NICOLE JOERNDT

X _____   Date   1/4/2021
Examiner Signature

APPS
29
3030 HARBOR LN 130, PLYMOUTH, MN 55447
763-746-3737

---



☒ **American General Life Insurance Company,** 2727-A Allen Parkway, Houston, TX 77019
☐ **The United States Life Insurance Company in the City of New York,** 175 Water St, New York, NY 10038
*A member of American International Group, Inc. (AIG)*

In this form, the "Company" refers to the insurance company whose name is checked above. The Company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other Company is responsible for such obligations or payments.

This addendum is part of the application to which it is attached. Addendum to *(Part A, Part B, etc.)*: See Section(s) Below

**Primary Proposed Insured**

First Name BOB _____ MI W_ Last Name RUTLEDGE _____ SSN ▓▓▓▓▓▓▓

*(Use the space below to provide explanations to any application questions or details to any "yes" answers where the space provided on the application is insufficient or to provide any additional required application information. Provide an appropriate reference to the specific questions for which answers and details are included below.)*

| |
|---|
| 1.          PERSONAL PHYSICIAN'S FACILITY: FAIRVIEW, USA. |

**Primary Proposed Insured (PPI) Signature**

X *(signature)*

PPI signed on (date)  1/4/2021

**Other Proposed Insured (OPI) Signature**

X

OPI signed on (date) _____

ICC15-108066

**Owner Signature**

X

*(If other than Primary Proposed Insured)*

Owner signed on (date) _____

Rev0516



☒ **American General Life Insurance Company,** 2727-A Allen Parkway, Houston, TX 77019
☐ **The United States Life Insurance Company in the City of New York,** 175 Water St, New York, NY 10038
*A member of American International Group, Inc. (AIG)*

In this form, the "Company" refers to the insurance company whose name is checked above. The Company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other Company is responsible for such obligations or payments.

This addendum is part of the application to which it is attached.  Addendum to *(Part A, Part B, etc.)*:  See Section(s) Below

## Primary Proposed Insured

First Name Bob _____ MI W Last Name Rutledge _____ SSN ▮▮▮▮▮

*(Use the space below to provide explanations to any application questions or details to any "yes" answers where the space provided on the application is insufficient or to provide any additional required application information.  Provide an appropriate reference to the specific questions for which answers and details are included below.)*

| | |
|---|---|
| IRS | I am not subject to backup withholding |
| Certification | I am exempt from backup withholding |

**Primary Proposed Insured (PPI) Signature**

X  *eSigned by Bob W Rutledge on 1/4/2021 at 2:50 PM CST*

PPI signed on (date)  1/4/2021

**Other Proposed Insured (OPI) Signature**

X

OPI signed on (date) _____

ICC15-108088

**Owner Signature**

X

*(If other than Primary Proposed Insured)*

Owner signed on (date) _____

Rev0516

# AMERICAN GENERAL LIFE
## Insurance Company
A Stock Company

This is an INDETERMINATE PREMIUM TERM LIFE INSURANCE POLICY WITH A CHANGE IN THE FACE AMOUNT AFTER THE LEVEL PREMIUM PERIOD. A Death Benefit is payable upon the Insured's death while this policy is in force prior to the Termination Date of the Last Renewal Term Period. Premium payments are payable for the term period shown on the Policy Schedule. This policy is ANNUALLY RENEWABLE, CONVERTIBLE and contains RE-ENTRY OPTION. NONPARTICIPATING - THIS POLICY WILL NOT PAY DIVIDENDS.

For Information, Service or to make a Complaint

Contact Your Servicing Agent, or Our Policyowner Service Department

P.O. Box 9000
Amarillo, Texas 79105-9000
1-844-452-3832

© American International Group, Inc.  All Rights Reserved.

ICC19-19311

January 14, 2021

Statement Of Policy Cost And Benefit Information
30 Year Renewable Level Benefit Premium Period
Change in Face Amount After Level Premium Period
Term Life Insurance

American General Life Insurance Company
2727-A Allen Parkway
Houston, Texas 77019

KEVIN J WILSHUSEN
MATRIX DIRECT INC
SUITE 200
9640 GRANITE RIDGE DR
SAN DIEGO, CA 92123

Policy Number:   4209668408          Insured:   ROBERT W RUTLEDGE          Age 51/Male

| Policy Year | Maximum Annual Life Insurance Premium (Annual Life Insurance Premium Shall Not Exceed Premiums Shown Below) | Guaranteed Face Amount |
|---|---|---|
| 1 | $2,099.90 | $500,000.00 |
| 2 | $2,099.90 | $500,000.00 |
| 3 | $2,099.90 | $500,000.00 |
| 4 | $2,099.90 | $500,000.00 |
| 5 | $2,099.90 | $500,000.00 |
| 6 | $2,099.90 | $500,000.00 |
| 7 | $2,099.90 | $500,000.00 |
| 8 | $2,099.90 | $500,000.00 |
| 9 | $2,099.90 | $500,000.00 |
| 10 | $2,099.90 | $500,000.00 |
| 11 | $2,099.90 | $500,000.00 |
| 12 | $2,099.90 | $500,000.00 |
| 13 | $2,099.90 | $500,000.00 |
| 14 | $2,099.90 | $500,000.00 |
| 15 | $2,099.90 | $500,000.00 |
| 16 | $2,099.90 | $500,000.00 |
| 17 | $2,099.90 | $500,000.00 |
| 18 | $2,099.90 | $500,000.00 |
| 19 | $2,099.90 | $500,000.00 |
| 20 | $2,099.90 | $500,000.00 |
| At Age 60 | $2,099.90 | $500,000.00 |
| At Age 62 | $2,099.90 | $500,000.00 |
| At Age 65 | $2,099.90 | $500,000.00 |
| At Age 94 | $51,089.25 | $56,250.00 |

| Cost Indexes | Life Insurance Net Payment Cost Index | | Life Insurance Surrender Cost Index | |
|---|---|---|---|---|
| | 10 Year | 20 Year | 10 Year | 20 Year |
| Maximum Rates | 4.20 | 4.20 | 4.20 | 4.20 |

The columns of this representation do not reflect the fact that, because of interest, a dollar in the future has less value than a dollar today.

Important Notice -   During the ten day period from the date of delivery of this policy, it may be surrendered to the company for cancellation and a full refund of any money paid.

Statement Of Policy Cost And Benefit Information                    January 14, 2021

American General Life Insurance Company        For Additional Information
2727-A Allen Parkway                           About This Policy Contact:
Houston, Texas 77019                           KEVIN J WILSHUSEN
                                               MATRIX DIRECT INC
                                               SUITE 200
                                               9640 GRANITE RIDGE DR
                                               SAN DIEGO, CA 92123

Prepared For:     ROBERT W RUTLEDGE

Terminal Illness Accelerated Benefit Rider

Provides for a one-time payment in advance of the death benefit under the base contract
if the Insured Person is terminally ill with 24 months or less to live.  The amount advanced
will be carried as a lien against future contract benefits.  There is no charge for the rider.
However, there is a one-time charge of up to $250.00 if you choose to activate the rider.

American General Life Insurance Company          For Additional Information
2727-A Allen Parkway                             About This Policy Contact:
Houston, Texas 77019                             KEVIN J WILSHUSEN
                                                 MATRIX DIRECT INC
                                                 SUITE 200
                                                 9640 GRANITE RIDGE DR
                                                 SAN DIEGO, CA 92123

Prepared For:     ROBERT W RUTLEDGE

Chronic Illness Accelerated Benefit Rider (No Separate Premium)

Provides for a one-time payment in advance of the death benefit under the policy if the
Insured Person is certified as having a Qualifying Chronic Illness as described in the
rider.   Certain policy adjustments will be made based on the elected death benefit
amount to be accelerated.  There is no charge for the rider.  However, there is a one-time
charge of up to $250.00 if You choose to activate the rider.

4209668408

American General Life Insurance Company
2727-A Allen Parkway
Houston, Texas 77019

For Additional Information
About This Policy Contact:
KEVIN J WILSHUSEN
MATRIX DIRECT INC
SUITE 200
9640 GRANITE RIDGE DR
SAN DIEGO, CA 92123

Prepared For:     ROBERT W RUTLEDGE

Critical Illness Accelerated Benefit Rider

Provides for a one-time payment in advance of the death benefit under the policy if the Insured Person is diagnosed with and certified as having a Qualifying Critical Illness as described in the rider. Certain policy adjustments will be made based on the elected death benefit amount to be accelerated. There is no charge for the rider. However, there is a one-time charge of up to $250.00 if You choose to activate the rider.

4209668408

# Additional Important Information Regarding Your Policy

Policies issued by American General Life Insurance Company (AGL) except in New York, where issued by The United States Life Insurance Company in the City of New York (US Life).  Issuing companies AGL and US Life are responsible for financial obligations of insurance products and are members of American International Group, Inc. (AIG).



Bank Draft Authorization

c **American General Life Insurance Company,** 2727-A Allen Parkway, Houston, Texas 77019
c **The United States Life Insurance Company in the City of New York,** 175 Water Street, New York, NY 10038

In this form, the "Company" refers to the insurance company whose name is checked above. The Company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other Company is responsible for such obligations or payments.

**How Automatic Bank Draft Works:** Automatic bank draft is a debit service that offers a convenient way to pay insurance premiums. The Company will collect the insurance premiums from your bank account electronically – you do not need to write checks or mail in any payments. Premium withdrawals will appear on your bank statement, and your statements will be your receipts for payment of your premium.

| Policy Number, if available | Name of Insured/Applicant | Policy Number, if available | Name of Insured/Applicant |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**PAYMENT OPTIONS:  Please select ONLY one payment option:**

c    Draft Initial Premium and Draft Subsequent Premiums

   Initial Premium: $ _____   c At Issue   c At Submit (Not available for all products or Employer Sponsored Plans)
   - Initial premium at issue will be drafted at the time each policy is placed inforce.
     - o Subsequent premiums will occur on the requested draft date, if one is requested, or the policy effective date, per the requested mode, if no date is specified.
   - Initial premium will be drafted at Submit for those policies that qualify for this option. Additional initial premium due will be drafted at the time the policy is placed inforce.
     - o Subsequent premiums will occur on the requested draft date, if one is requested, or the policy effective date, per the requested mode, if no date is specified.

   Subsequent Premiums, if different: $ _____

c    Draft Only Subsequent Premiums

   Check/Complete one of the following for Initial Premium payment:

   c    Check submitted with application in the amount of $ _____ .
   c    Check submitted on delivery.

**DRAFT DETAILS:  Please provide the requested details.**

Preferred Withdrawal Date (1st-28th) _____ **Please debit my account for all outstanding premiums due.**
If a preferred withdrawal date is chosen and draft at issue is selected, we will draft subsequent premiums on this date.
Frequency:    c   Monthly    c   Quarterly    c   Semi-annual    c   Annual

Financial Institution Name _____

Financial Institution Address _____ City, State _____ ZIP _____

Type of Account:    c   Checking    c   Savings

Routing Number _____ (For checking account draft use routing # listed on check)

Account Number _____ (Do NOT use credit/debit card)

Bank Account Owner(s):  (For business accounts, list Business and Authorized Signer Name)

Name 1 First Name (Please Print) _____ Last Name _____

Email Address 1 _____

Date of Birth 1 (MM-DD-YYYY) _____ SSN1 / TIN 1 _____

Name 2 First Name (Please Print) _____ Last Name _____

Email Address 2 _____

Date of Birth 2 (MM-DD-YYYY) _____ SSN2 / TIN 2 _____

Bank Account Owner's Address: (For business accounts, list Business Address)

Street _____ City _____ State _____ ZIP _____

Page 1 of 2                                    AGLC108493-2015 Rev1019

**AGREEMENT:**

I (we) hereby authorize and request the Company or its representative to initiate electronic or other commercially accepted-type debits against the indicated bank account in the depository institution named ("Depository") for the payment of premiums and other indicated charges due on the contract(s) listed, and to continue to initiate such debits in the event of a conversion, renewal, or other change to any such contract(s) even if such debits differ in amount from those specified in this form. I (we) hereby agree to indemnify and hold the Company harmless from any loss, claim, or liability of any kind by reason of dishonor of any debit or otherwise related to this authorization.

I (we) understand that this Authorization will not affect the terms of the contract(s), other than the mode of payment, and that if premiums are not paid within the applicable grace period, the contract(s) will terminate, subject to any applicable non-forfeiture provision. I acknowledge that notice of premiums due shall be waived and that the debit appearing on my bank statement shall constitute my receipt of payment, but no payment is deemed made until the Company receives actual payment in its Service Center.

I (we) authorize the Company to obtain information and/or reports from a consumer reporting agency or other company(ies) in order to verify, validate and/or authenticate the information and answers presented on this form. Any information gathered may be disclosed to any person or entity required to receive such information by law or as I may further consent.

I (we) agree that this Authorization may be terminated by me or the Company at any time and for any reason by providing thirty (30) days' written notice of such termination to the non-terminating party and may be terminated by the Company immediately if any debit is not honored by the Depository named for any reason. This request must be dated and all required signatures must be written in ink, using full legal names. This request must be dated and signed by the Bank Account Owner(s) as his/her name appears on bank records for the account provided on this authorization.

Signature of Bank Account Owner

X _____

Date _____

Signature of Bank Account Owner, if joint account

X _____

Date _____

**Please attach voided check for checking account draft or deposit slip for savings account draft.**

AGLC108493-2015 Rev1019

| FACTS | WHAT DO AMERICAN GENERAL LIFE INSURANCE COMPANY (AGL) AND THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK (US Life) DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and Medical Information<br>• Income and Credit History<br>• Payment History and Employment Information<br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons AGL & US Life choose to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Do AGL & US Life share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, conduct research including data analytics, or report to credit bureaus | Yes | No |
| **For our marketing purposes** — to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** — information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** — information about your creditworthiness | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| Questions? | For AGL / US Life Insurance Customers: call 844-452-3832, go to www.aig.com/lifeinsurance or write to us at P.O. Box 818005, Cleveland, OH 44181.<br><br>For AGL / US Life Accident & Health Customers: call 800-811-2696, go to www.aig.com/lifeinsurance or write us at Customer Service, P.O. Box 818005, Cleveland, OH 44181.<br><br>For AGL / US Life Individual Annuities Customers: call 800-242-4079, go to https://www.aig.com/individual/investments/annuities or write to us at P.O. Box 2708, Amarillo, TX 79105-2708.<br><br>For AGL / US Life Group Annuities Customers: call 877-299-1724, email us at immediateannuity@aig.com or write to us at Group Annuity Administration, P.O. Box 1277, Wilmington, DE 19899-1277.<br><br>For AGL / US Life Group Benefit Business Customers: call 800-346-7692, email us at www.aig.com/lifeinsurance or write to us at 3600 Route 66, 4th Floor, Neptune, NJ 07753.[1] |

## Who we are

**Who is providing this notice?**

American General Life Insurance Company and The United States Life Insurance Company in the City of New York.

## What we do

**How do AGL & US Life protect my personal information?**

To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We restrict access to employees, representatives, agents, or selected third parties who have been trained to handle nonpublic personal information.

**How do AGL & US Life collect my personal information?**

We collect your personal information, for example, when you
- apply for insurance or pay insurance premiums
- file an insurance claim or give us your income information
- provide employment information

We also collect your personal information from others, such as credit bureaus, affiliates, or other companies.

**Why can't I limit all sharing?**

Federal law gives you the right to limit only
- sharing for affiliates' everyday business purposes—information about your creditworthiness
- affiliates from using your information to market to you
- sharing for nonaffiliates to market to you

State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law.

## Definitions

**Affiliates**

Companies related by common ownership or control. They can be financial and nonfinancial companies.
- *Our affiliates include the member companies of American International Group, Inc.*

**Nonaffiliates**

Companies not related by common ownership or control. They can be financial and nonfinancial companies.
- *AGL and US Life do not share with nonaffiliates so they can market to you.*

A formal agreement between nonaffiliated financial companies that together market financial products or services to you.
- *Our joint marketing partners include companies with which we jointly offer insurance products, such as a bank.*

## Other important information

**For Vermont Residents only.** We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures. Additional information concerning our privacy policies can be found using the contact information above for Questions.

**For California Residents only.** We will not share information we collect about you with nonaffiliated third parties, except as permitted by California law, such as to process your transactions or to maintain your account.

**For Nevada Residents only.** We are providing this notice pursuant to Nevada state law. You may elect to be placed on our internal Do Not Call list by calling the numbers referenced in the Questions section. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington Street, Suite 3900, Las Vegas, NV 89101; Phone number: 702-486-3132; email: aginfo@ag.nv.gov. You may contact our customer service department by using the contact information referenced in the Questions section.

You have the right to see and, if necessary, correct personal data. This requires a written request, both to see your personal data and to request correction. We do not have to change our records if we do not agree with your correction, but we will place your statement in our file. If you would like a more detailed description of our information practices and your rights, please write to us at the addresses indicated on the first page.

[1]AIG's Group Benefits Business is the marketing name of the following insurance company subsidiaries of American International Group, Inc. (AIG) underwriting property-casualty, accident & health, and life insurance: American General Life Insurance Company, and The United States Life Insurance Company in the City of New York.

# LIFE INSURANCE BUYER'S GUIDE

**This guide can help you when you shop for life insurance. It discusses how to:**

- Find a Policy That Meets Your Needs and Fits Your Budget

- Decide How Much Insurance You Need

- Make Informed Decisions When You Buy a Policy

*Prepared by the National Association of Insurance Commissioners*

The National Association of Insurance Commissioners is an association of state insurance regulatory officials. This association helps the various Insurance Departments to coordinate insurance laws for the benefit of all consumers.

This Guide Does Not Endorse Any Company Or Policy

Reprinted by American General Life Insurance Company

May, 2015

AGLC108755

## Important Things to Consider

1. Review your own insurance needs and circumstances. Choose the kind of policy that has benefits that most closely fit your needs. Ask an agent or company to help you.

2. Be sure that you can handle premium payments. Can you afford the initial premium? If the premium increases later and you still need insurance, can you still afford it?

3. Don't sign an insurance application until you review it carefully to be sure all *the* answers are complete and accurate.

4. Don't buy life insurance unless you intend to stick with your plan. It may be very costly if you quit during the early years of the policy.

5. Don't drop one policy and buy another without a thorough study of the new policy and the one you have now. Replacing your insurance may be costly**.**

6. Read your policy carefully. Ask your agent or company about anything that is not clear to you.

7. Review your life insurance program with your agent or company every few years to keep up with changes in your income and your needs.

## Buying Life Insurance

When you buy life insurance, you want coverage that fits your needs.

First, decide how much you need - and for how long - and what you can afford to pay. Keep in mind the major reason you buy life insurance is to cover the financial effects of unexpected or untimely death. Life insurance can also be one of the many ways you plan for the future.

Next, learn what kinds of policies will meet your needs and pick the one that best suits you.

Then, choose the combination of policy premium and benefits that emphasizes protection in case of early death, or benefits in case of long life, or a combination of both.

It makes good sense to ask a life insurance agent or company to help you. An agent can help you review your insurance needs and give you information about the available policies. If one kind of policy doesn't seem to fit your needs, ask about others.

This guide provides only basic information. You can get more facts from a life insurance agent or company or from your public library.

## What About the Policy You Have Now?

If you are thinking about dropping a life insurance policy, here are some things you should consider:

- If you decide to replace your policy, don't cancel your old policy until you have received the new one. You then have a minimum period to review your new policy and decide if it is what you wanted.

- It may be costly to replace a policy. Much of what you paid in the early years of the policy you have now, paid for the company's cost of selling and issuing the policy. You may pay this type of cost again if you buy a new policy.

- Ask your tax advisor if dropping your policy could affect your income taxes.

- If you are older or your health has changed, premiums for the new policy will often be higher. You will not be able to buy a new policy if you are not insurable.

- You may have valuable rights and benefits in the policy you now have that are not in the new one.

- If the policy you have now no longer meets your needs, you may not have to replace it. You might be able to change your policy or add to it to get the coverage or benefits you now want.

- At least in the beginning, a policy may pay no benefits for some causes of death covered in the policy you have now.

In all cases, if you are thinking of buying a new policy, check with the agent or company that issued you the one you have now. When you bought your old policy, you may have seen an illustration of the benefits of your policy. Before replacing your policy, ask your agent or company for an updated illustration. Check to see how the policy has performed and what you might expect in the future, based on the amounts the company is paying now.

## How Much Do You Need?

Here are some questions to ask yourself:

- How much of the family income do I provide? If I were to die early, how would my survivors, especially my children, get by? Does anyone else depend on me financially, such as a parent, grandparent, brother or sister?

- Do I have children for whom I'd like to set aside money to finish their education in the event of my death?

- How will my family pay final expenses and repay debts after my death?

- Do I have family members or organizations to whom I would like to leave money?

- Will there be estate taxes to pay after my death?

- How will inflation affect future needs?

As you figure out what you have to meet these needs, count the life insurance you have now, including any group insurance where you work or veteran's insurance. Don't forget Social Security and pension plan survivor's benefits. Add other assets you have: savings, investments, real estate and personal property. Which assets would your family sell or cash in to pay expenses after your death?

## What Is the Right Kind of Life Insurance?

All policies are not the same. Some give coverage for your lifetime and others cover you for a specific number of years. Some build up cash values and others do not. Some policies combine different kinds of insurance, and others let you change from one kind of insurance to another. Some policies may offer other benefits while you are still living. Your choice should be based on your needs and what you can afford.

There are two basic types of life insurance: term insurance and cash value insurance. Term insurance generally has lower premiums in the early years, but does not build up cash values that you can use in the future. You may combine cash value life insurance with term insurance for the period of your greatest need for life insurance to replace income.

*Term Insurance* covers you for a term of one or more years. It pays a death benefit only if you die in that term. Term insurance generally offers the largest insurance protection for your premium dollar. It generally does not build up cash value.

You can renew most term insurance policies for one or more terms even if your health has changed. Each time you renew the policy for a new term, premiums may be higher. Ask what the premiums will be if you continue to renew the policy. Also ask if you will lose the right to renew the policy at some age. For a higher premium, some companies will give you the right to keep the policy in force for a guaranteed period at the same price each year. At the end of that time you may need to pass a physical examination to continue coverage, and premiums may increase.

You may be able to trade many term insurance policies for a cash value policy during a conversion period - even if you are not in good health. Premiums for the new policy will be higher than you have been paying for the term insurance.

*Cash Value Life Insurance* is a type of insurance where the premiums charged are higher at the beginning than they would be for the same amount of term insurance. The part of the premium that is not used for the cost of insurance is invested by the company and builds up a cash value that may be used in a variety of ways. You may borrow against a policy's cash value by taking a policy loan. If you don't pay back the loan and the interest on it, the amount you owe will be subtracted from the benefits when you die, or from the cash value if you stop paying premiums and take out the remaining cash value. You can also use your cash value to keep insurance protection for a limited time or to buy a reduced amount without having to pay more premiums. You also can use the cash value to increase your income in retirement or to help pay for needs, such as a child's tuition without canceling the policy. However, to build up this cash value, you must pay higher premiums in the earlier years of the policy. Cash value life insurance may be one of several types; whole life, universal life and variable life are all types of cash value insurance.

*Whole Life Insurance* covers you for as long as you live if your premiums are paid. You generally pay the same amount in premiums for as long as you live. When you first take out the policy, premiums can be several times higher than you would pay initially for the same amount of term insurance. But they are smaller than the premiums you would eventually pay if you were to keep renewing a term policy until your later years.

Some whole life policies let you pay premiums for a shorter period such as 20 years, or until age 65. Premiums for these policies are higher since the premium payments are made during a shorter period.

*Universal Life Insurance* is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage. Increases may require proof that you qualify for the new death benefit. The premiums you pay (less expense charges) go into a policy account that earns interest. Charges are

deducted from the account. If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower. If it keeps dropping, eventually your coverage will end. To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits. Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value.

*Variable Life Insurance* is a kind of insurance where the death benefits and cash values depend on the investment performance of one or more separate accounts, which may be invested in mutual funds or other investments allowed under the policy. Be sure to get the prospectus from the company when buying this kind of policy and STUDY IT CAREFULLY. You will have higher death benefits and cash value if the underlying investments do well. Your benefits and cash value will be lower or may disappear if the investments you chose didn't do as well as you expected. You may pay an extra premium for a guaranteed death benefit.

## Life Insurance Illustrations

You may be thinking of buying a policy where cash values, death benefits, dividends or premiums may vary based on events or situations the company does not guarantee (such as interest rates). If so, you may get an illustration from the agent or company that helps explain how the policy works. The illustration will show how the benefits that are not guaranteed will change as interest rates and other factors change. The illustration will show you what the company guarantees. It will also show you what *could* happen in the future. Remember that nobody knows what will happen in the future. You should be ready to adjust your financial plans if the cash value doesn't increase as quickly as shown in the illustration. You will be asked to sign a statement that says you understand that some of the numbers in the illustration are not guaranteed.

AGLC108755

## Finding a Good Value in Life Insurance

After you have decided which kind of life insurance is best for you, compare similar policies from different companies to find which one is likely to give you the best value for your money. A simple comparison of the premiums is not enough. There are other things to consider. For example:

- Do premiums or benefits vary from year to year?

- How much do the benefits build up in the policy?

- What part of the premiums or benefits is not guaranteed?

- What is the effect of interest on money paid and received at different times on the policy?

Remember that no one company offers the lowest cost at all ages for all kinds and amounts of insurance. You should also consider other factors:

- How quickly does the cash value grow? Some policies have low cash values in the early years that build quickly later on. Other policies have a more level cash value build-up. A year-by-year display of values and benefits can be very helpful. (The agent or company will give you a policy summary or an illustration that will show benefits and premiums for selected years.)

- Are there special policy features that particularly suit your needs?

- How are non-guaranteed values calculated? For example, interest rates are important in determining policy returns. In some companies increases reflect the average interest earnings on all of that company's policies regardless of when issued. In others, the return for policies issued in a recent year, or a group of years, reflects the interest earnings on that group of policies; in this case, amounts paid are likely to change more rapidly when interest rates change.

AGLC108755

**American General Life Insurance Company**

## Policyowner Acknowledgement of Policy Delivery or
## Producer's Certification of Mailing of Policy to the Policyowner

Policyowner:  ROBERT W RUTLEDGE                    Policy Number:  4209668408

Insured/Annuitant:   ROBERT W RUTLEDGE

### Policyowner Acknowledgement of Policy Delivery

Execution of this receipt by the Policyowner constitutes an acknowledgement of delivery.

Policy provisions regarding the right to return the policy and receive a refund of premiums will become effective as of the date this Policyowner Acknowledgement of Policy Delivery is signed.

Terms of this acknowledgement are subject to the provisions of the policy contract and any applicable laws and regulations.

### By signing below you attest to the following:

*I was physically located in the United States of America when all solicitation activities regarding Policy No. 4209668408 occurred and when all medical examination, telephone interviews and other application-related events, **including all signatures required to complete the application** for the policy occurred.*

Policyowner Signature: _____     Date: _____

Agent Name: _____

Agent Signature: _____     Date: _____

Location Signed: _____     _____
                              City                                              State

### Agent Certification of Mailing of Policy to the Policyowner

*This section is not applicable for Foreign National policy contracts.  The above section must be signed by both Policy Owner and Agent for all Foreign National contracts.*

Because the policy referenced above was mailed to the Policyowner, no Policyowner signature was obtained.  However, I hereby declare that the policy contract was mailed to the Policyowner on the date entered below and that I have retained in my files evidence of the mailing.

Date Mailed to Policyholder: _____

Agent Name: _____

Agent Signature: _____     Date: _____

**American General Life Insurance Company**

---

### Policyowner Acknowledgement of Policy Delivery or
### Producer's Certification of Mailing of Policy to the Policyowner

Policyowner:  ROBERT W RUTLEDGE                    Policy Number:  4209668408

Insured/Annuitant:  ROBERT W RUTLEDGE

**Policyowner Acknowledgement of Policy Delivery**

Execution of this receipt by the Policyowner constitutes an acknowledgement of delivery.

Policy provisions regarding the right to return the policy and receive a refund of premiums will become effective as of the date this Policyowner Acknowledgement of Policy Delivery is signed.

Terms of this acknowledgement are subject to the provisions of the policy contract and any applicable laws and regulations.

**By signing below you attest to the following:**

*I was physically located in the United States of America when all solicitation activities regarding Policy No. 4209668408 occurred and when all medical examination, telephone interviews and other application-related events, **including all signatures required to complete the application** for the policy occurred.*

Policyowner Signature: _____        Date: _____

Agent Name: _____

Agent Signature: _____        Date: _____

Location Signed: _____        _____
                              City                                              State

**Agent Certification of Mailing of Policy to the Policyowner**

*This section is not applicable for Foreign National policy contracts.  The above section must be signed by both Policy Owner and Agent for all Foreign National contracts.*

Because the policy referenced above was mailed to the Policyowner, no Policyowner signature was obtained.  However, I hereby declare that the policy contract was mailed to the Policyowner on the date entered below and that I have retained in my files evidence of the mailing.

Date Mailed to Policyholder: _____

Agent Name: _____

Agent Signature: _____        Date: _____

---

AGLC101336                          Home Office Copy                          MN
                                                                              Rev 0418

## American General Life Insurance Company

### Policyowner Acknowledgement of Policy Delivery or
### Producer's Certification of Mailing of Policy to the Policyowner

Policyowner: ROBERT W RUTLEDGE               Policy Number: 4209668408

Insured/Annuitant: ROBERT W RUTLEDGE

### Policyowner Acknowledgement of Policy Delivery

Execution of this receipt by the Policyowner constitutes an acknowledgement of delivery.

Policy provisions regarding the right to return the policy and receive a refund of premiums will become effective as of the date this Policyowner Acknowledgement of Policy Delivery is signed.

Terms of this acknowledgement are subject to the provisions of the policy contract and any applicable laws and regulations.

### By signing below you attest to the following:

*I was physically located in the United States of America when all solicitation activities regarding Policy No. 4209668408 occurred and when all medical examination, telephone interviews and other application-related events, **including all signatures required to complete the application** for the policy occurred.*

Policyowner Signature: _____    Date: _____

Agent Name: _____

Agent Signature: _____    Date: _____

Location Signed: _____    _____
                        City                                    State

### Agent Certification of Mailing of Policy to the Policyowner

*This section is not applicable for Foreign National policy contracts. The above section must be signed by both Policy Owner and Agent for all Foreign National contracts.*

Because the policy referenced above was mailed to the Policyowner, no Policyowner signature was obtained. However, I hereby declare that the policy contract was mailed to the Policyowner on the date entered below and that I have retained in my files evidence of the mailing.

Date Mailed to Policyholder: _____

Agent Name: _____

Agent Signature: _____    Date: _____

# AMERICAN GENERAL LIFE INSURANCE COMPANY

## 2727-A ALLEN PARKWAY,
## HOUSTON, TEXAS 77019
## 844-452-3832

## NOTICE CONCERNING POLICYHOLDER RIGHTS IN AN
## INSOLVENCY UNDER THE MINNESOTA LIFE AND HEALTH
## INSURANCE GUARANTY ASSOCIATION LAW

If the insurer or health maintenance organization that issued your life, annuity, or health insurance policy becomes impaired or insolvent, you are entitled to compensation for your policy or contract from the assets of that insurer. The amount you recover will depend on the financial condition of the insurer or health maintenance organization.

In addition, residents of Minnesota who purchase life insurance, annuities, or health insurance, or health maintenance organization coverage from insurance companies authorized to do business in Minnesota are protected, SUBJECT TO LIMITS AND EXCLUSIONS, in the event the insurer or health maintenance organization becomes financially impaired or insolvent. This protection is provided by the Minnesota Life and Health Insurance Guaranty Association.

For purposes of this notice, the terms "insurance company" and "insurer" include health maintenance organizations.

Minnesota Life & Health Insurance Guaranty Association
90 South Seventh Street 3300 Wells Fargo Center
Minneapolis, MN 55402
(612) 322-8713

The maximum amount the guaranty association will pay for all policies or contracts issued on one life by the same insurer or health maintenance organization is limited to $500,000. Subject to this $500,000 limit, the guaranty association will pay up to $500,000 in life insurance death benefits, $130,000 in net cash surrender and net cash withdrawal values for life insurance, $500,000 in health insurance, health maintenance organization, and long-term care benefits, including any net cash surrender and net cash withdrawal values, $500,000 in disability income insurance, $250,000 in annuity net cash surrender and net cash withdrawal values, $410,000 in present value of annuity benefits for annuities which are part of a structured settlement or for annuities in regard to which periodic annuity benefits, for a period of not less than the annuitant's lifetime or for a period certain of not less than ten years, have begun to be paid on or before the date of impairment or insolvency, or if no coverage limit has been specified for a covered policy or benefit, the coverage limit shall be $500,000 in present value.

Unallocated annuity contracts issued to retirement plans, other than defined benefit plans, established under section 401, 403(b), or 457 of the Internal Revenue Code of 1986, as amended through December 31, 1992, are covered up to $250,000 in net cash surrender and net cash withdrawal values, for Minnesota residents covered by the plan provided, however, that the association shall not be responsible for more than $10,000,000 in claims from all Minnesota residents covered by the plan. If total claims exceed $10,000,000, the $10,000,000 shall be prorated among all claimants. These are the maximum claim amounts.

Coverage by the guaranty association is also subject to other substantial limitations and exclusions and requires continued residency in Minnesota. If your claim exceeds the guaranty association's limits, you may still recover a part or all of that amount from the proceeds of the liquidation of the insolvent insurer, if any exist. Funds to pay claims may not be immediately available. The guaranty association assesses insurers and health maintenance organizations licensed to sell life and health insurance in Minnesota after the insolvency occurs. Claims are paid from this assessment.

Benefits provided by a long-term care rider to a life insurance policy or annuity contract shall be considered the same type of benefits as the base life insurance policy or annuity contract to which it relates.

THE COVERAGE PROVIDED BY THE GUARANTY ASSOCIATION IS NOT A SUBSTITUTE FOR USING CARE IN SELECTING INSURANCE COMPANIES THAT ARE WELL MANAGED AND FINANCIALLY STABLE. IN SELECTING AN INSURANCE COMPANY, CONTRACT, OR POLICY, YOU SHOULD NOT RELY ON COVERAGE BY THE GUARANTY ASSOCIATION.

THIS NOTICE IS REQUIRED BY MINNESOTA STATE LAW TO ADVISE POLICYHOLDERS OF LIFE, ANNUITY, OR HEALTH INSURANCE, OR HEALTH MAINTENANCE ORGANIZATION POLICIES AND CONTRACTS OF THEIR RIGHTS IN THE EVENT THEIR INSURANCE CARRIER BECOMES FINANCIALLY IMPAIRED OR INSOLVENT. THIS NOTICE IN NO WAY IMPLIES THAT THE COMPANY CURRENTLY HAS ANY TYPE OF FINANCIAL PROBLEMS. ALL LIFE, ANNUITY, AND HEALTH INSURANCE, AND HEALTH MAINTENANCE ORGANIZATION POLICIES AND CONTRACTS ARE REQUIRED TO PROVIDE THIS NOTICE.

For AIG Home Office Use Only

Policies issued by American General Life Insurance Company (AGL) except in New York, where issued by The United States Life Insurance Company in the City of New York (US Life).  Issuing companies AGL and US Life are responsible for financial obligations of insurance products and are members of American International Group, Inc. (AIG).